# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALVIN BROWN, | Case No. 1:25-cv-01764-DLF |
| *Plaintiff*, | **PLAINTIFF'S REPLY IN SUPPORT OF PARTIAL MOTION FOR SUMMARY JUDGMENT [35] / OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [36]** |
| v. | |
| DONALD J. TRUMP, et al., | |
| *Defendants*. | |
| | |
| ALVIN BROWN, | Case No. 1:26-cv-01249-DLF |
| *Petitioner*, | **PETITIONER'S OPPOSITION TO RESPONDENT'S MOTION TO DISMISS [15]** |
| v. | |
| JOHN DELEEUW, | |
| *Respondent*. | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................. 3

   I.   Facts .................................................................................................................... 3

   II.   Procedural history ............................................................................................. 6

ARGUMENT ........................................................................................................................ 7

   I.   The NTSB'S removal protections do not violate the separation of powers. ..................... 8

       A.   The NTSB's safety recommendations do not bind or constrain any executive agency. ................................................................................................................ 8

       B.   The NTSB exercises investigative and informative powers to develop non-binding safety recommendations. .................................................................. 9

       C.   The NTSB participates in international investigations under Annex 13 precisely because it is independent. ............................................................ 13

       D.   The NTSB's incidental role in post-accident family assistance does not require at-will removal of NTSB members. .............................................. 16

       E.   The NTSB's appellate function weighs in favor of more, not less, independence.... 19

   II.   Mr. Brown has plausibly alleged a claim of intentional racial discrimination. ................ 22

       A.   The FAC's allegations satisfy the standards for a disparate treatment comparator claim. ......................................................................................................... 22

       B.   Mr. Brown has stated a proper claim under the proper legal standard. .................... 26

   III.   Mr. Brown's Fifth Amendment claim is legally cognizable ............................................ 35

       A.   The President's removal decisions can be reviewed by courts for compliance with the Constitution. ...................................................................................... 35

       B.   Courts can reasonably assess a President's intent in removal decisions. ................. 39

       C.   Courts, not the Senate, are the proper forum for reviewing removal decisions. ....... 41

   IV.   Mr. Brown is entitled to a remedy for his unlawful removal. ......................................... 42

       A.   The Court should grant a writ of mandamus. ............................................................ 42

       B.   Mr. Brown's quo warranto petition should not be dismissed. .................................. 43

       C.   Defendants fail to rebut Mr. Brown's entitlement to injunctive relief. ..................... 46

       D.   The Court should award declaratory relief. ............................................................... 49

CONCLUSION .................................................................................................................... 50

**TABLE OF AUTHORITIES**

**Cases**

*Albright v. Oliver*, 510 U.S. 266 (1994)..................................................................................27

*Alston v. City of Madison*, 853 F.3d 901 (7th Cir. 2017)..........................................................30

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946) ...............................................................20

*\*Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025) ....................22, 23, 28, 31, 39

*Andrews v. Warden*, 958 F.3d 1072 (11th Cir. 2020)................................................................36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................24

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) .......................................................................20

*Baker v. McCollan*, 443 U.S. 137 (1979)..................................................................................27

*Ballou v. McElvain*, 29 F.4th 413 (9th Cir. 2022) ................................................................27, 29

*Brehm v. Marocco*, No. 1:25-CV-660-RJL, 2025 WL 4083345 (D.D.C. Mar. 11, 2025) ...........47

*Brown v. Brody,* 199 F.3d 446 (D.C. Cir. 1999) .......................................................................30

*\*Brown v. General Services Administration,* 425 U.S. 820 (1976) .............................................28

*Brown v. Sessoms*, 774 F.3d 1016 (D.C. Cir. 2014 ...........................................................23, 24, 27

*\*Buckley v. Valeo*, 424 U.S. 1 (1976).....................................................................................8, 10

*Carey v. Fed. Express Corp.*, 519 F. App'x 772 (3d Cir. 2013).................................................31

*Chambers v. D.C.,* 35 F.4th 870 (D.C. Cir. 2022)....................................................................30

*Chiron Corp. & PerSeptive Biosystems v. NTSB,* 198 F.3d 935 (D.C. Cir. 1999) .........................1

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)..................................................27

*Clinton v. Jones*, 520 U.S. 681 (1997) ................................................................................35, 50

*Collins v. Nitkin*, NTSB Order No. EM-193, 2002 WL 1727347 (NTSB July 23, 2002) ............20

*Collins v. NTSB*, 351 F.3d 1246, 1254 (D.C. Cir. 2003) ..........................................................20

*Collins v. Yellen*, 594 U.S. 220, 250 n.18 (2021) .....................................................................19

*Crim v. Comm'r of Internal Revenue*, 66 F.4th 999 (D.C. Cir. 2023)..........................................21

*Davis v. Billington*, 76 F. Supp. 3d 59 (D.D.C. 2014)..................................................................47

*Davis v. Passman*, 442 U.S. 228 (1979) ......................................................................................28

*Delgado v. Chavez*, 140 U.S. 586 (1891).....................................................................................42

*Dellinger v. Bessent*, No. 25-552, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025)...........................47

*Dickson v. Defreitas*, NTSB Order No. EA-5906, 2021 WL 3929998 .........................................20
    (NTSB Aug. 24, 2021)

*DOT v. Ass'n of Am. Railroads*, 575 U.S. 43 (2015)....................................................................21

*Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 297 (1981) ..........................................................20

*DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 291 (D.D.C. 2012) .......................29

*Egbert v. Boule*, 596 U.S. 482 (2022) ........................................................................................28

*Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) .............................................................................37

*Farris v. Rice*, 453 F. Supp. 2d 76 (D.D.C. 2006) .......................................................................47

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)....................................................................35, 50

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)......................................18

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)..................................................................................35

*Garvey v. NTSB*, 190 F.3d 571 (D.C. Cir. 1999)..........................................................................19

*Gen Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375 (1981) ...................................28

*Ginger v. Dist. of Columbia*, 527 F.3d 1340 (D.C. Cir. 2008) .....................................................23

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ..............................................................................33

*Grundmann v. Trump*, 770 F. Supp. 3d 166 (D.D.C. 2025), *vacated and remanded on
    other grounds,* No. 25-5165, 2026 WL 303730 (D.C. Cir. Feb. 4, 2026) ................................50

*Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988) ....................................................................26

*Hager v. Ark. Dep't of Health*, 735 F.3d 1009 (8th Cir. 2013)................................................27, 28

*Harper v. Bessent*, 795 F. Supp. 3d 28 (D.D.C. 2025).................................................................50

*\*Harris v. Bessent*, 160 F.4th 1235 (D.C. Cir. 2025)................................................18, 19, 21, 43

*Harris v. Bessent*, 775 F. Supp. 3d 164 (D.D.C. 2025)................................................................43

*Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155 (7th Cir. 1998) ...........................................47

*Hinson v. NTSB*, 57 F.3d 1144 (D.C. Cir. 1995) .............................................1, 19, 20

*Holbrook v. Reno*, 196 F.3d 255 (D.C. Cir. 1999)............................................................23

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ......................................................30

*Hornsby-Culpepper v. Ware*, 906 F.3d 1302 (11th Cir. 2018) .......................................27

*Hurd v. Hodge*, 334 U.S. 24 (1948) ..............................................................................27

*In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19 (D.D.C. 2018) ...................14

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .................................22, 32

*Jiggetts v. Cipullo*, 774 F.Supp.3d 168 (D.D.C. 2025) .............................................26, 29

*Jo v. Dist. of Columbia*, 582 F. Supp. 2d 51 (D.D.C. 2008) .........................................26

*Johnson v. City of Shelby*, 574 U.S. 10 (2014)................................................................27

*Jones v. Trailways Corp.*, 477 F. Supp. 642 (D.D.C. 1979)...........................................29

*Joyner v. Morrison & Foerster LLP*, 140 F.4th 523 (D.C. Cir. 2025) .......2, 23, 24, 25, 30, 31, 33

*Joyner v. Morrison & Foerster LLP*, No. 20-1440, 2023 WL 6313194
    (D.D.C. Sept. 27, 2023) ............................................................................................24

*Kalbfus v. Siddons*, 42 App. D.C. 310 (D.C. Cir. 1914)...................................42, 44, 46

*Korematsu v. United States*, 323 U.S. 214 (1944) ..........................................................36

*Kuretski v. Comm'r of Internal Revenue*, 755 F.3d 929 (D.C. Cir. 2014)......................21

*LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1 (D.D.C. 2025)............43

*LeBlanc v. United States Priv. & C.L. Oversight Bd.*, No. 25-5197, 2025 WL 1840591
    (D.C. Cir. July 1, 2025)..............................................................................................43

*Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019).........................................29

*Lyles v. Hughes*, 83 F. Supp. 3d 315 (D.D.C. 2015) ......................................................29

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)......................................................42

*Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144 (1991) ..............20

*McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005) ......................................40

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ....................................2, 22, 23, 29, 31

*Mitchell v. Mills*, 895 F.3d 365 (5th Cir. 2018) ..........................................................................26

*Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116 (D.D.C. 2023) .............................24

*Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972).....................................................................28

*Morrison v. Olson*, 487 U.S. 691 (1988).................................................................................8, 19

*Mullin v. Doe*, No. 25-1083, 2026 WL 1825840 (June 25, 2026) ...........................................40, 41

*Myers v. United States*, 272 U.S. 52 (1926)..........................................................................35, 42

*Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461 (D.C. Cir. 2017)......................................23, 33

*Oates v. Dist. of Columbia*, 824 F.2d 87 (D.C. Cir. 1987) ..........................................................26

*Omnipoint Corp. v. FCC*, 78 F.3d 620 (D.C. Cir. 1996)..............................................................29

*Papp v. Ailsworth*, NTSB Order No. EM-211, 2011 WL 7141395 (NTSB Dec. 28, 2011) ..........20

*Peele v. Country Mut. Ins. Co.*, 288 F.3d 319 (7th Cir. 2002) .....................................................31

*Pham v. NTSB*, 33 F.4th 576 (D.C. Cir. 2022) ...........................................................................20

*Ponce v. Billington*, 679 F.3d 840 (D.C. Cir. 2012) ..............................................................23, 29

*Perlmutter v. Blanche*, No. 25-5285, 2025 WL 2627965 (D.C. Cir. Sep. 10, 2025) ............47, 48

*Rosemond v. Hudgins*, 92 F.4th 518 (4th Cir. 2024) ..................................................................36

*Sampson v. Murray*, 415 U.S. 61 (1974).....................................................................................47

*Samuels v. Mackell*, 401 U.S. 66 (1971) ...............................................................................49, 50

*Schick v. Reed*, 419 U.S. 256 (1974)...........................................................................................36

*Seila L. LLC v. CFPB*, 591 U.S. 197 (2020)..........................................................................18, 20

*Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023)......................................................................42

*Sibley v. Obama*, 866 F. Supp. 2d 17 (D.D.C. 2012) ..................................................................45

*Sibley v. Obama*, No. 12-5198, 2012 WL 6603088 (D.C. Cir. Dec. 6, 2012)..............................45

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181
    (2023).................................................................................................................................38

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ..................................................................43, 50

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002) ......................................................23, 24, 30

*Talbott v. United States*, 176 F.4th 720 (D.C. Cir. 2026) ............................................................35

*Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981).....................................................23, 27

*Trump v. Boyle*, 145 S. Ct. 2653 (2025).................................................................................19, 48

*Trump v. Cook*, 146 S. Ct. 2234 (2026) .........................................................37, 39, 42, 43, 44, 48

*Trump v. Hawaii*, 585 U.S. 667 (2018) ...........................................................................36, 39, 40

*Trump v. Slaughter*, 146 S. Ct. 2283 (2026) .................................................1, 8, 18, 20, 30, 37, 43

*Trump v. Slaughter*, 222 L. Ed. 2d 1230 (Sept. 8, 2025)...............................................................43

*Trump v. United States*, 603 U.S. 593 (2024) .........................................................................35, 36

*Trump v. Vance*, 591 U.S. 786 (2020) .......................................................................................35

*Trump v. Wilcox*, 145 S. Ct. 1415 (2025) ..........................................................................19, 43, 48

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983) ........................................28, 39

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021)......................................................................18

*United States v. Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807) ..............................................................35

*United States v. Collins*, No. 09-cv-6473, 2009 WL 5058813 (W.D.N.Y. Sept. 17, 2009) .....16, 18

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936)..........................................15

*United States v. Navarro*, No. 24-3006, 2026 WL 2093909 (D.C. Cir. July 21, 2026) .................10

*United States v. Nixon*, 418 U.S. 683 (1974) .................................................................37, 39, 40

*United States v. Perkins*, 116 U.S. 483 (1886)..........................................................................34

*United States v. Virginia*, 518 U.S. 515 (1996).........................................................................38

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977).............................................................................................26, 29, 33, 34

*Washington v. Davis*, 426 U.S. 229 (1976) ...........................................................................22, 34

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977 (1988) ............................................................22

*Wilcox v. Trump*, 775 F. Supp. 3d 215, 237 n.22 (2025)..............................................................43

*Wright v. Eugene & Agnes E. Meyer Foundation*, 68 F.4th 612 (D.C. Cir. 2023).......................33

vi

*Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59 (2d Cir. 2015)...................................................26

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)...................................................................................33

*Younger v. Harris*, 401 U.S. 37 (1971) ......................................................................................43

*\*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ....................................36, 37, 39

*Zigler v. Abbasi*, 582 U.S. 120 (2017) .......................................................................................28

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ..........................................................15

**Statutes**

22 U.S.C. § 5513.........................................................................................................................15

26 U.S.C. § 6212.........................................................................................................................21

26 U.S.C. § 6214.........................................................................................................................21

28 U.S.C. § 2201.........................................................................................................................50

3 U.S.C. § 411.............................................................................................................................29

42 U.S.C. § 2000e-16..................................................................................................................29

49 U.S.C. § 1101.........................................................................................................................25

49 U.S.C. § 1111 ................................................................................................................. passim

49 U.S.C. § 1116...........................................................................................................................8

49 U.S.C. § 1131.............................................................................................................8, 11, 12, 16

49 U.S.C. § 1135...........................................................................................................................8

49 U.S.C. § 1136..............................................................................................................16, 17, 18

49 U.S.C. § 1139..............................................................................................................16, 17, 18

49 U.S.C. § 1140.........................................................................................................................16

49 U.S.C. § 1151..............................................................................................................10, 11, 18

49 U.S.C. § 1155.........................................................................................................................18

49 U.S.C. § 24316.......................................................................................................................17

49 U.S.C. § 40104.......................................................................................................................15

49 U.S.C. § 41113 ...............................................................................................................17

49 U.S.C. § 41313 ...............................................................................................................17

49 U.S.C. § 44106 ...............................................................................................................21

49 U.S.C. § 44703 ...............................................................................................................21

49 U.S.C. § 44709 ...............................................................................................................21

49 U.S.C. § 44710 ...............................................................................................................19

D.C. Code. § 16-3503 ....................................................................................................44, 45

FAA Act of 1958, § 1007(a)–(b), 72 Stat. 796..............................................................10,11

Pub. L. No. 103-272, 108 Stat. 745 (1994)........................................................................10

## Rules

Fed. R. Civ. P. 25...............................................................................................................45

## Regulations

49 C.F.R. § 831.22 ..............................................................................................................14

49 C.F.R. § 831.5 ................................................................................................................17

NTSB, Investigation Procedures, 82 Fed. Reg. 29670 (June 29, 2017) ...................11, 13

## Constitutional Provisions

U.S. Const. art. II, § 2, cl. 2 ...............................................................................................42

## Other Authorities

1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834) ...................................................37

1 Annals of Cong. 455 (Joseph Gales ed., 1834)...............................................................37

FAA, Order 8020.11D, Aircraft Accident and Incident Notification Policy, Investigation,
and Reporting ch. 4 (eff. May 10, 2018), https://perma.cc/A8FW-D4D8 ..........................12, 14

FEMA, *Assistance for Governments and Private Non-Profits After a Disaster* (last
updated Apr. 8, 2026), https://perma.cc/GD26-KE7V..................................................16

FEMA, *Assistance for Housing and Other Needs* (last updated July 29, 2026),
https://perma.cc/W9HF-G2W4.....................................................................................16

H.R. Rep. 97-108, 1981 U.S.C.C.A.N. 1731 ................................................................9, 12

H.R. Rep. No. 104-793 (1996)..........................................................................................16, 17

ICAO, *Annex 13 to the Convention on Int'l Civ. Aviation: Aircraft Accident & Incident Investigation* § 5.18 (13th ed. 2024), https://perma.cc/HVN9-MT49 .................................13, 14

ICAO, *Manual of Aircraft Accident and Incident Investigation (Doc 9756) Part I: Organization and Planning* § 2.1.2 (2d ed. 2015) https://perma.cc/6GX7-WVNE ............14, 15

James L. High, *A Treatise on Extraordinary Legal Remedies* (3d ed. 1896)..................................46

Kim Christensen, *Kobe Bryant crash renews battle over rejected safety regulations*, L.A. Times (Feb. 2, 2020), https://perma.cc/WWY2-5C6R .................................................................9

Nominations, Congress.gov, *PN730-4—Jeffrey Anderson—Department of State*, https://perma.cc/4XVR-632D ...........................................................................................15

NTSB, *Annual Report to Congress* (2025), https://perma.cc/W4SJ-LGY4 ....................................9

NTSB, *Fiscal Year 2027 Budget Request* (2026), https://perma.cc/U98C-NGMU.......................17

NTSB, *NTSB's Role in Foreign Aviation Investigations* (updated Mar. 3, 2026), https://perma.cc/RA9C-AQVV ...........................................................................................14

S. Comm. on Homeland Sec. & Gov't Affs., 118th Cong., *U.S. Government Policy and Supporting Positions* (Comm. Print Nov. 12, 2024), https://perma.cc/K5V3-4YJF ................15

*The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47 (1982)...........................................................................................................................10

Title VI Legal Manual (Updated): Section VI—Proving Discrimination—Intentional Discrimination, Dep't of Just., https://perma.cc/C8MK-34R8 (last accessed Aug. 1, 2026) ....................................................................................................................30

## INTRODUCTION

When airplanes crash or ships run into bridges, the National Transportation Safety Board ("NTSB") investigates such accidents for the sole purpose of suggesting safety improvements to prevent future accidents. The public trusts the NTSB to do its job, which may include criticizing other federal agencies, with objectivity and thoroughness.

Defendants have provided no good reason why this system must be undermined by rendering NTSB members removable at will and subject to the President's political whims. The NTSB cannot compel anyone to follow its recommendations or even to respond to them. It "neither promulgates nor enforces any . . . safety regulations." *Chiron Corp. & PerSeptive Biosystems v. NTSB*, 198 F.3d 935, 937 (D.C. Cir. 1999). Like Congress, the NTSB can, in support of its investigations, hold hearings and obtain evidence including by subpoena. But contrary to Defendants' assertions, it cannot enforce subpoenas, nor can it pursue any other civil action in court, even if the action involves interference with NTSB investigations, unless the Department of Justice ("DOJ") agrees to do so on its behalf. In its appellate role, the NTSB is "[p]urely adjudicatory," as the D.C. Circuit has put it. *Hinson v. NTSB*, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995). Nothing in *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), prohibits for-cause protections for members of such an agency. The NTSB does not substantively regulate primary conduct nor have the combination of substantive rulemaking, enforcement, and adjudication functions that "unitary" agencies like the FTC have. Because 49 U.S.C. § 1111(c) is constitutional, and because Defendants do not dispute that President Trump violated the statute by firing Mr. Brown without cause, the Court should grant relief.

Mr. Brown's removal was also racially discriminatory, in violation of the Fifth Amendment. While *Slaughter* changed the distribution of power between Congress and the President, it did not change the principle that the President—like the other two branches of government—cannot trample on individual constitutional rights and that courts can review the President's actions to ensure they comply with the Constitution. While Defendants argue that such review should not be available for the President's exercise of "conclusive and preclusive" powers,

1

controlling precedent allows courts to review even core presidential powers when those powers are exercised in unconstitutional ways. The implication of Defendants' contrary arguments would be a system where the President, like a king, can freely violate individual constitutional rights without accountability. Nothing in the Constitution supports that result.

Contrary to Defendants' contentions, Mr. Brown's First Amended Complaint plausibly alleges that Mr. Brown's removal was motivated by race. Under the Supreme Court's seminal decision regarding disparate-treatment employment claims like Mr. Brown's, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequent cases applying it, Mr. Brown's burden is quite modest at the pleadings stage. He need only allege that at least one other person of a different race who was positioned similarly to him in at least some relevant respects was not removed. *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 531 (D.C. Cir. 2025). The FAC alleges there are two such comparators, fellow Democratic NTSB members Jennifer Homendy and Thomas Chapman. Mr. Brown and his two comparators were appointed under the same statutory process, their duties as NTSB members were the same, and they are all Democrats. Yet, only Mr. Brown, who is Black, was removed. Ms. Homendy and Mr. Chapman are white and were not removed. That is all Mr. Brown needs to plausibly allege a claim. Defendants devote much of their argument to disputing Mr. Brown's additional allegations of discriminatory conduct, but those arguments relate to whether Mr. Brown has proven discriminatory treatment under the third step of the *McDonnell Douglas* test, which is not required at the motion to dismiss stage.

Defendants' policy arguments also fail. Defendants' concerns about the burdensomeness of inquiring into the President's motivations are better reserved for disputes during discovery than on a motion to dismiss. District courts have considerable discretion to regulate the scope of discovery and are better positioned to evaluate any potential privileges when the issue becomes ripe. Defendants also argue that allowing Mr. Brown's claim to proceed will open the floodgates for claims challenging presidential appointments as discriminatory in the future. But that ignores key differences between removals and appointments and conflates an adverse action taken against one person because of his race with nondiscriminatory efforts by past Presidents to seek cabinets

2

that are representative of the country. And Defendants' remaining argument, unsupported by any legal citation—that the Constitution allows only a political check on removals via the Senate—ignores that courts can and do review the scope of constitutional rights and provide remedies for individuals whose rights have been violated in a way the Senate cannot. Such an opportunity to vindicate his constitutional rights is precisely what Mr. Brown here seeks.

## BACKGROUND

### I.      Facts

Mr. Brown challenges his removal on two grounds. The facts relevant to the first ground—President Trump's violation of the NTSB statute's restriction on removals of Board members, 49 U.S.C. § 1111(c)—and the procedural history of Mr. Brown's two cases were described in Plaintiff's motion for partial summary judgment ("Pl.'s MSJ") at 2–9, Dkt. No. 35-1,[1] and so will not be repeated here. The facts relevant to the second ground—President Trump's racially discriminatory firing of Mr. Brown—are as follows:

President Biden nominated Plaintiff Alvin Brown as a Democratic member of the NTSB in August 2022 and renominated him on January 23, 2023. He was unanimously confirmed by the Senate by voice vote on March 8, 2024, to a term expiring on December 31, 2026. First Amend. Compl. ("FAC") ¶ 32, Dkt. No. 25.

Prior to his appointment to the NTSB, Mr. Brown had a long and distinguished career as a public servant in urban planning, public administration, and transportation. He served as senior advisor to former Commerce Secretary Ron Brown, Vice President Al Gore's Senior Advisor for Urban Policy, and executive director of the White House Community Empowerment Board. FAC ¶ 33. He was the first-ever Black person elected as mayor of Jacksonville, Florida and served from 2011 to 2015. During his mayoral tenure, he served as Chair of the Port and Exports Council and Vice-Chair of the Transportation Committee for the United States Conference of Mayors. FAC

---

[1] All citations to docket entries refer to the docket in *Brown v. Trump*, 1:25-cv-01764-DLF (D.D.C.) ("*Brown I*") unless otherwise specified.

¶ 33. He also served as senior advisor for community infrastructure opportunities at the United States Department of Transportation. FAC ¶ 33. While serving at the NTSB, Mr. Brown was involved in a variety of transportation investigations, spanning hearings on a gas-fueled factory explosion in Pennsylvania,[2] to inquiries over the mid-air exit door departure of an Alaska Airlines flight.[3]

On May 5, 2025, at 6:57 p.m., Mr. Brown received an email from Trent Morse, the Deputy Director of Presidential Personnel at the White House. The entire body of the email reads as follows:

> Alvin,
>
> On behalf of President Donald J. Trump, I am writing to inform you that your position on the National Transportation Safety Board is terminated effective immediately.
>
> Thank you for your service.
>
> Trent Morse
> Deputy Director
> Presidential Personnel

FAC ¶ 34. As the email reflects, Mr. Brown was given no reason for his removal. FAC ¶ 34. Defendants Homendy and NTSB cut off Mr. Brown's access to NTSB systems, email, and offices on May 6, 2025, and Mr. Brown has not been able to perform his duties as a Board Member since that date. FAC ¶ 35.

Mr. Brown's removal was the first time in the NTSB's history that a sitting member of the NTSB has been removed prior to the expiration of their term. FAC ¶ 39.

Mr. Brown is a Black man. FAC ¶ 37. At the time of his removal from the NTSB there were four other members on the Board: Defendant Chair Jennifer Homendy and Members Michael

---

[2] *See Opening Statement - On The Investigation Into The Natural Gas–Fueled Explosion And Fire West Reading, Pennsylvania, March 24, 2023*, NTSB (Dec. 10, 2024), https://www.ntsb.gov/Advocacy/Activities/Pages/homendy-20241210o.aspx.

[3] *See Opening Remarks NTSB Investigative Hearing on Alaska Airlines Flight 1282*, NTSB (Aug. 6, 2024), https://www.ntsb.gov/Advocacy/Activities/Pages/Homendy20240806.aspx.

E. Graham, Thomas B. Chapman, and J. Todd Inman.[4] FAC ¶ 37. Homendy, Graham, Chapman, and Inman are all white. FAC ¶ 37. Homendy and Chapman are Democratic members. Graham and Inman are Republicans. FAC ¶ 37. At the time of Mr. Brown's removal, Member Chapman's term on the NTSB had already expired on December 31, 2023, and Member Chapman was continuing to serve despite his expired term. FAC ¶ 38. Had President Trump simply wished to remove a Democrat and exert Republican control over the Board, President Trump could have nominated a Republican to the seat in which Mr. Chapman was serving as a holdover. FAC ¶ 38. He could have also removed Ms. Homendy. FAC ¶ 38.[5]

On September 10, 2025, President Trump nominated John DeLeeuw, a white man, to Mr. Brown's position. Mr. DeLeeuw was confirmed on February 26, 2026, and took his oath of office on March 16, 2026. *Brown v. DeLeeuw*, 1:26-cv-01249-DLF ("*Brown II*"), Pet. ¶¶ 28, 44, Dkt. 1.

Mr. Brown's firing fits within a pattern of the Trump Administration disproportionately removing Black government officials, and particularly presidentially appointed and Senate-confirmed Board members of independent multimember agencies. FAC ¶ 40. From the beginning of President Trump's second term in office to the date of filing of the First Amended Complaint, approximately 75 percent of Black federal officials leading multimember agencies were removed from office. FAC ¶ 40. In contrast, only approximately 27 percent of white federal officials on multimember agencies were removed during that period. FAC ¶ 40. President Trump removed or attempted to remove six Black members of multi-member agencies during that period. FAC ¶ 40.

The removal of Mr. Brown and other Black independent agency board commissioners

---

[4] Mr. Inman was removed from the NTSB on March 6, 2026, allegedly for alcohol use, harassment, absenteeism, and misuse of government resources. Chris Marquette, *White House says NTSB member was fired for inappropriate alcohol use, harassment*, Politico (Mar. 9, 2026, 12:01 PM EDT), https://www.politico.com/news/2026/03/09/ntsb-member-fired-alcohol-harassment-00818712.

[5] Mr. Chapman was re-nominated and confirmed for a second term by the Senate on August 7, 2026. *See PN901-3 — Thomas B. Chapman — National Transportation Safety Board*, Congress.gov, https://www.congress.gov/nomination/119th-congress/901/3 (last accessed Aug. 10, 2026).

reflects a broader pattern across the government of President Trump removing high-level Black officials. FAC ¶ 42. On May 8, 2025, he removed Carla Hayden, a Black woman, as the Librarian of Congress. FAC ¶ 42. On February 21, 2025, he removed Gen. Charles Q. Brown, Jr., a Black man, as the Chairman of the Joint Chiefs of Staff. In General Brown's case, President Trump replaced him with Lieutenant General Dan Caine, a white man, who did not have the statutory requirement of status as a five-star general and could serve only because the President waived that requirement. FAC ¶ 42.

President Trump and high government officials have made several public statements indicating that he and his administration are seeking to dismantle efforts promoting diversity throughout the federal government. FAC ¶ 43–47. As part of this attack, the Administration has equated the presence of Black officials with adherence to DEI policies and, at times, removed them from office. FAC ¶ 48. After Mr. Trump terminated Ms. Hayden as Librarian of Congress, the White House Press Secretary referenced the "quite concerning things that she had done at the Library of Congress in pursuit of DEI" in explaining the decision on May 5, 2025. FAC ¶ 48. Before his appointment, Secretary of Defense Pete Hegseth suggested that General Brown had obtained his appointment because of his race and stated that General Brown needed to be fired because of his commitment to diversity, equity, and inclusion. FAC ¶ 48.

Under President Trump, the Executive Branch has also at times put a clear and demonstrable emphasis on hiring white men, including in Department of Labor workforce posters featuring almost exclusively white men. FAC ¶ 49. More generally, Black officials and Black employees across the federal government have been removed from their jobs at disproportionate rates. FAC ¶ 50. And in the Trump Administration's first 200 days, only two percent of all of President Trump's Senate-approved appointees have been Black individuals. FAC ¶ 51.

## II.    Procedural history

In *Brown I*, Mr. Brown asserts two causes of action: (1) the President violated 49 U.S.C. § 1111 by removing Mr. Brown without a showing of inefficiency, neglect of duty, or malfeasance

in office; and (2) the President violated the Fifth Amendment by removing Mr. Brown because of his race. FAC ¶¶ 52–63. The defendants in *Brown I* are President Trump, the NTSB, and NTSB Chair Jennifer Homendy. *Id.* ¶¶ 16–18. After Mr. DeLeeuw took Mr. Brown's seat, Mr. Brown filed a petition for a writ of quo warranto against Mr. DeLeeuw "out of an abundance of caution in the event the *Brown I* defendants argue that Mr. DeLeeuw's confirmation precludes Mr. Brown from obtaining relief except through a writ of quo warranto." *Brown II*, Pet. ¶ 5. The substantive reasons why Mr. Brown's removal was unlawful, and therefore why a petition should be granted to oust Mr. DeLeeuw from the seat that was never vacant, are the same as in *Brown II* as in *Brown I*. *Id.* ¶¶ 24–43.[6]

Pursuant to the briefing schedule adopted by the Court, Minute Order (July 3, 2026), Mr. Brown filed a motion for partial summary judgment on Count I in *Brown I* on July 15, 2026. Dkt. No. 35 ("Pls.' MSJ"). On July 29, Defendants filed a combined opposition to Plaintiff's motion for summary judgment, motion to dismiss Counts I and II in *Brown I*, and a motion to dismiss *Brown II*. *Brown I*, Dkt. Nos. 36–37; *Brown II*, Dkt. No. 15 ("Defs.' MTD").

## ARGUMENT

The Court should grant summary judgment to Mr. Brown on Count I and should deny Defendants' motions to dismiss. Mr. Brown was illegally removed from his seat on the NTSB without cause. Even now, Defendants do not suggest that there was any inefficiency, neglect of duty, or malfeasance in office. 49 U.S.C. § 1111(c). Section 1111(c) is a constitutionally valid limit on the President's removal power because the NTSB does not wield executive power that requires at-will removal. Mr. Brown's removal was also unlawful for the independent reason that it was racially discriminatory. Should the Court agree that Mr. Brown's removal was unlawful, the Court should issue declaratory relief as well as a writ of mandamus or in the alternative enjoin Defendants NTSB and Chair Homendy from giving effect to his unlawful removal. Should a writ

---

[6] While the quo warranto action runs solely against Respondent DeLeeuw—not the *Brown I* Defendants—this brief for simplicity uses "Defendants" to refer collectively to Defendants in *Brown I* and Respondent DeLeeuw in *Brown II*.

of quo warranto be needed to quiet title to the seat as between Mr. Brown and Mr. DeLeeuw, the Court should also issue that writ.

### I.    The NTSB'S removal protections do not violate the separation of powers.

Defendants do not dispute that President Trump violated 49 U.S.C. § 1111(c) by firing Mr. Brown without cause. Defendants dispute only whether § 1111(c) is constitutional. 49 U.S.C. § 1111(c) is constitutional because the NTSB's functions are such that at-will removal is not "essential to the President's proper execution of his Article II powers." *Morrison v. Olson*, 487 U.S. 654, 691 (1988). As *Slaughter* acknowledged, "not all offices created by Congress necessarily come with executive or even sovereign power attached." *Trump v. Slaughter*, 146 S. Ct. 2283, 2305 (2026). Congress is still free "to establish independent agencies to assist it with its functions." *Id.* at 2302 (citing *Buckley v. Valeo*, 424 U.S. 1, 137–38 (1976) (per curiam)).

### A.  The NTSB's safety recommendations do not bind or constrain any executive agency.

The NTSB's primary function is to investigate accidents to make safety recommendations to prevent future accidents. Its recommendations are available to the public, including Congress, federal, state, and local agencies, and anyone interested in transportation safety. 49 U.S.C. §§ 1116(a), 1131(e). Like a congressional committee, the NTSB investigates facts to develop proposals that Congress and other policymakers consider but neither its findings regarding the probable cause of the accidents nor its recommendations are binding on anyone. It has no authority to compel private parties or other government agencies to follow its findings or recommendations.

Defendants do not dispute the non-binding nature of the NTSB's recommendations. They contend, however, that NTSB's provision of recommendations is nevertheless "executive" because the Secretary of Transportation must consider and respond in writing to the NTSB's recommendations. Defs.' MTD at 20. That is incorrect. Although Congress directed that DOT respond in writing and that both the recommendations and responses be included in the NTSB's reports and in an annual DOT report to Congress, *see* 49 U.S.C. §§ 1116(c), 1135, the purpose of the response-and-report requirement was not to force DOT to adopt the recommendations. Rather,

8

Congress recognized that DOT would not accept every recommendation, and instead merely directed DOT to consider them so as to allow Congress "to watch more closely the progress of the Board and of the [DOT] in improving transportation safety." H.R. Rep. No. 97-108, pt. 1, at 3, *as reprinted in* 1981 U.S.C.C.A.N. 1729, 1731. The response-and-report requirement thus serves Congress's own legislative purposes, helping Congress determine whether new legislation or other congressional action is needed.

The requirement does not give the NTSB any power over DOT. If the Secretary decides not to respond, for example, the NTSB cannot force him or her to do so. Furthermore, regardless of DOT's response, the NTSB's recommendations are not binding on DOT—DOT must make its own decisions on whether to adopt them or not. Defendants point out that DOT quickly implemented the NTSB's March 2025 recommendation "in part," to prohibit helicopter operations when certain runways are used at Reagan Washington National Airport (DCA), after a collision between a helicopter and an airplane killed 67 people there in January 2025. Defs.' MTD at 20. Presumably DOT took up that recommendation because it was a good one that would enhance safety. Had DOT (or the President) believed the recommendation was not a good one, DOT was free to reject it. DOT has rejected many NTSB recommendations in the past.[7] And even where DOT adopts a recommendation, it can reverse that decision at any time, for any reason.

### B. The NTSB exercises investigative and informative powers to develop non-binding safety recommendations.

Defendants also argue that the NTSB's investigations and use of tools like subpoenas traditionally used by Executive Branch agencies makes it executive. Defs.' MTD at 17–18. But the key is not what investigative tools the NTSB has, but what those investigative tools are for. The

---

[7] *See, e.g.*, NTSB, *Annual Report to Congress* at 65 (2025), https://perma.cc/W4SJ-LGY4 (listing NTSB safety recommendations closed in 2025 because DOT disagreed with them); *id.* at 46 (in 2025, 9 NTSB safety recommendations to FAA were classified as "closed in an acceptable status"; 6 were "closed in an unacceptable status"; and 60 were "open-unacceptable response"); Kim Christensen, *Kobe Bryant crash renews battle over rejected safety regulations*, L.A. Times (Feb. 2, 2020), https://perma.cc/WWY2-5C6R (describing examples of FAA disagreeing with NTSB recommendations).

9

NTSB has investigatory power, including the incidental authority to issue subpoenas, for the purpose of making non-binding safety recommendations. Again, this is analogous to how congressional committees use subpoenas—to investigate facts and develop proposals for Congress as a whole to consider. *See Buckley*, 424 U.S. at 137-38 ("[T]here can be no question that the [Federal Election] Commission as presently constituted may exercise" powers "essentially of an investigative and informative nature, falling in the same general category as those powers which Congress might delegate to one of its own committees."); *United States v. Navarro*, No. 24-3006, 2026 WL 2093909, at *1 (D.C. Cir. July 21, 2026) ("Each House of Congress can delegate its full subpoena power to 'committees and subcommittees.'").

Defendants also claim the NTSB can bring civil actions to prevent interference with its investigations, including to enforce subpoenas. Defs.' MTD at 18. But as Plaintiff explained (and Defendants ignore), the NTSB has no independent litigating authority, so the NTSB cannot bring civil actions unless the Attorney General agrees to do so on its behalf. Pls.' MSJ at 14-15. Thus, the "discretionary power to seek judicial relief" belongs to the Attorney General, not the NTSB. *See Buckley*, 424 U.S. at 138. While § 1151(a) states that the NTSB may bring a civil action, it lacks the language DOJ itself says is necessary to grant independent litigating authority: there is no text "authorizing [the NTSB] to employ outside counsel (or to use their own attorneys) to represent them in court." *The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47, 56–57 (1982). As a result, the NTSB cannot act on its own pursuant to § 1151(a) but must rely on the Attorney General to initiate civil actions.

Section 1151's statutory history confirms this reading. The current language of § 1151 was the result of a 1994 act "[t]o revise, codify, and enact *without substantive change*" various transportation laws in title 49 of the U.S. Code. Pub. L. No. 103-272, 108 Stat. 745, 745 (1994) (emphasis added). The original source of 49 U.S.C. § 1151 was § 1007 of the Federal Aviation Act of 1958. *See* 49 U.S.C. § 1151 (2018) (Historical and Revision Notes). Subsection (a) of § 1007 was subheaded "Jurisdiction of Court" and subsection (b) was subheaded "Application for Enforcement," indicating that subsection (a) is intended to address which courts would have

10

jurisdiction over the action while subsection (b) describes who would bring the action (the Attorney General). *See* Federal Aviation Act of 1958, Pub. L. No. 85-726, § 1007(a)–(b), 72 Stat. 731, 796. Plaintiff's reading also gives subsection (c) of § 1151 a more natural reading. Subsection (c) allows the NTSB to participate in the civil action upon the Attorney General's request. *See* 49 U.S.C. § 1151(c). If § 1151(a) allowed the NTSB to bring civil actions on its own as Defendants contend, then § 1151(c) would be largely redundant. Finally, NTSB's own historical practice also supports Plaintiff's reading. Defendants have not identified a single instance in which the NTSB has brought a civil action on its own.[8] That reflects the understanding that the NTSB has no authority to bring a civil action on its own and can only try to persuade DOJ to do so.

Finally, Defendants argue that the NTSB's investigative powers are executive because other agencies use information from the NTSB to carry out their own law enforcement and other investigative functions and because the NTSB's investigation has "priority" over other agencies' under 49 U.S.C. § 1131(a)(2). Defs.' MTD at 23. That other agencies can potentially use information from the NTSB for law enforcement purposes does not transform the NTSB into a regulator or enforcer. If an agency like DOT used information uncovered through a congressional committee's investigation, that would not render the committee's powers "executive" such that the President must be able to remove the committee members at will. The same is true of the NTSB. No matter what other agencies do with the information gathered by the NTSB, the NTSB itself still does nothing more than make non-binding safety recommendations.

The NTSB itself has acknowledged this distinction: "Congress intended that it share information with other agencies in a timely manner *while remaining independent of enforcement and other regulatory activities intrinsic to those agencies.*" NTSB, Investigation Procedures, 82 Fed. Reg. 29670, 29673 (June 29, 2017) (emphasis added). NTSB and FAA practices also reflect this distinction. The NTSB historically has asked other agencies to maintain "a figurative 'wall'

---

[8] Defendants have identified only five instances from 1989 to today of the NTSB bringing civil actions. In each instance, DOJ brought suit on NTSB's behalf. *See* Defs.' MTD at 18 n.7 (citing examples).

between their agency's enforcement and investigative duties." *Id.* at 29678. Under FAA policy, "no enforcement action will be undertaken by any of the participants of an NTSB safety investigation" and "FAA inspectors performing the enforcement work must acquire their own evidence and information through their own efforts separate from the NTSB safety investigation." FAA, Order 8020.11D, Aircraft Accident and Incident Notification Policy, Investigation, and Reporting ch. 4, ¶ 6.b, 6.e (eff. May 10, 2018), https://perma.cc/A8FW-D4D8. For instance, FAA and NTSB investigators can speak to a witness at the same time, but they take separate notes, and if the FAA is collecting evidence to use against an airman or other regulated party, "there must be no question in the mind of the person from whom the evidence is being requested that the inspector is not working under the direction of the NTSB." *Id.* ¶¶ 6.e, 6.f.

Defendants cite 49 U.S.C. § 1131(a)(2), which states that NTSB investigations have "priority" over other government investigations in certain types of accidents. Contrary to Defendants' suggestion, § 1131(a)(2) does not give the NTSB authority to investigate for enforcement purposes. As noted, the sole purpose of the NTSB's investigation is to identify the probable cause of an accident, so that the NTSB can develop safety recommendations that also do not bind or constrain other agencies. Also contrary to Defendants' argument, § 1131(a)(2) does not make other agencies' exercise of executive power dependent or contingent on the NTSB's investigations. The FAA, for example, has its own authority to investigate in parallel. 49 U.S.C. § 40113; *see* FAA, Order 8020.11D ch. 2. Having "priority" does not give the NTSB authority to interfere with the FAA's work. *See* 49 U.S.C. § 1131(a)(3) (§ 1131 "do[es] not affect the authority of another department, agency, or instrumentality of the Government to investigate an accident under applicable law or to obtain information directly from the parties involved in, and witnesses to, the accident."). Congress enacted § 1131(a)(2) simply to reduce the waste of taxpayer dollars on unnecessary turf battles and duplicative fact-gathering by multiple agencies. H.R. Rep. No. 97-108, pt. 2, at 3, *as reprinted in* 1981 U.S.C.C.A.N. 1734, 1736. While § 1131(a)(2) prioritizes the NTSB's expert and objective gathering of information for the purpose of making safety recommendations, Congress at the same time recognized that the same information might

12

be relevant to both the NTSB's work and the regulatory and enforcement agencies' work. In aviation accidents, for instance, there is unsurprisingly often "overlap" in the information that the FAA needs for rulemaking or law enforcement and that the NTSB needs for its recommendations. NTSB, Investigation Procedures, 82 Fed. Reg. at 29684. If a plane crash is potentially caused by an intoxicated pilot, for example, that may be relevant to a potential license revocation or future rulemaking by FAA and also relevant to the NTSB's formulation of recommendations (and potential congressional legislation) to prevent similar errors in the future. Designating the NTSB to coordinate and allowing information-sharing reduces the instances of multiple interviews of the same witnesses or duplicative testing or information requests. But other agencies are free to do their own witness interviews, testing, or requests if they would like.

### C. The NTSB participates in international investigations under Annex 13 precisely because it is independent.

The Court should also reject Defendants' contention that the NTSB's members must be removable at will by the President because, when invited, the NTSB participates in international aviation accident investigations under Annex 13 of the Convention on International Civil Aviation ("Chicago Convention"). Defs.' MTD at 19. This argument is ironic: the NTSB assists in international investigations under Annex 13 precisely because the NTSB is independent. Under Annex 13, if an accident involving a U.S.-registered, U.S.-designed, or U.S.-manufactured aircraft or a U.S. operator occurs in another country, the United States may appoint an "accredited representative" to participate in that country's investigation. *See* ICAO, *Annex 13 to the Convention on International Civil Aviation: Aircraft Accident & Incident Investigation* § 5.18 (13th ed. 2024), https://perma.cc/HVN9-MT49 ("Annex 13"). The accredited representative is "normally . . . from the State's accident investigation authority." *Id.* § 1. Signatory states must establish an "accident investigation authority" that is "independent from State aviation authorities and other entities that could interfere with the conduct or objectivity of an investigation." *Id.* § 3.2. As an accompanying manual explains, "[t]he accident investigation authority must be strictly objective and totally impartial and must also be perceived to be so. The authority should be

13

established in such a way that it can withstand political or other interference or pressure." ICAO, *Manual of Aircraft Accident and Incident Investigation (Doc 9756) Part I: Organization and Planning* § 2.1.2 (2d ed. 2015) ("Annex 13 Manual"), https://perma.cc/6GX7-WVNE. Doing away with NTSB members' for-cause removal protections would undermine the NTSB's ability to be impartial and the public's perception of the NTSB's objectivity and expertise. It makes little sense that the NTSB must lose its statutory independence because of its participation in international investigations under Annex 13 when its independence is why the U.S. appoints the NTSB to participate in international investigations under Annex 13 in the first place.[9]

Defendants also overstate the NTSB's role and omit the State Department's and DOT's roles in foreign affairs. The NTSB "fulfills the obligations of the United States under Annex 13, *in coordination with and consistent with the requirements of the United States Department of State*." 49 C.F.R. § 831.22(b)(1) (2025) (emphasis added); *see also* NTSB, *NTSB's Role in Foreign Aviation Investigations* (updated Mar. 3, 2026), https://perma.cc/RA9C-AQVV ("The NTSB will work closely with Department of State when invited to a foreign state to assist under Annex 13."). The State Department—not the NTSB—is responsible for diplomatic relations with the International Civil Aviation Organization ("ICAO"), the "specialized agency of the United Nations" created by the Chicago Convention that "establish[es] standards for regulating international civil aviation," including Annex 13. *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19, 26 n.8 (D.D.C. 2018). The President appoints (and the Senate confirms) an ambassador who serves as the U.S. representative to the ICAO, and who sits within the State

---

[9] Alternatively, the word "normally" in Annex 13's definition of "accredited representative" suggests that Annex 13 could be read not to require the United States to appoint someone from the independent NTSB to assist in international investigations. *See also* FAA, Order 8020.11D, ch. 1 ¶ 7.a (defining "Accredited Representative" as "an individual, *typically* an NTSB investigator") (emphasis added). Under that reading, to the extent the President is free to cut the NTSB out of the process and appoint someone from another agency that is not independent, that is further reason why at-will removal of NTSB members is not necessary to the President's ability to supervise the United States' participation in international investigations.

14

Department.[10] Congress has also directed the FAA to "exercis[e] leadership" in the ICAO. 49 U.S.C. § 40104(d)(1).[11]

That the NTSB helps with foreign accident investigations does not give the President carte blanche to disregard congressionally imposed checks like the removal restrictions in 49 U.S.C. § 1111(c). Defendants quote *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), which described the President as "the sole organ of the federal government in the field of international relations." Defs.' MTD at 19. But as the Supreme Court has more recently noted, "[t]his description of the President's exclusive power was not necessary to the holding of *Curtiss-Wright*—which, after all, dealt with congressionally authorized action, not a unilateral Presidential determination." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). The Court emphasized that, "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law," and "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Id.* Here in particular, it makes little sense to infer from the NTSB's Annex 13 role that the President must be able to override the controls and checks Congress enacted. Without 49 U.S.C. § 1111(c), the United States could not fulfill its commitment to having "independent" international accident investigators who "can withstand political or other interference or pressure." Annex 13 § 3.2; Annex 13 Manual § 2.1.2.

---

[10] *See* S. Comm. on Homeland Sec. & Gov't Affs., 118th Cong., *U.S. Government Policy and Supporting Positions* 108 (Comm. Print Nov. 12, 2024), https://perma.cc/K5V3-4YJF ("Plum Book"); Nominations, *PN730-4—Jeffrey Anderson—Department of State*, Congress.gov, https://perma.cc/4XVR-632D (last visited Aug. 11, 2026) (President Trump's nominee currently awaiting confirmation).

[11] Reflecting these cabinet departments' leading roles, Congress tasks the Secretary of State and/or the Secretary of Transportation with making proposals to ICAO. *See, e.g.*, 22 U.S.C. § 5513 ("[T]he Secretary of State, in consultation with the Secretary of Transportation, shall propose to the International Civil Aviation Organization the establishment of a comprehensive aviation security program . . . ."); *id.* § 3373(b) ("The Secretary of State, in coordination with the Secretary of Commerce and the Secretary of Transportation, is authorized— . . . (2) to instruct the United States representative to the ICAO to (A) use the voice and vote of the United States to ensure Taiwan's meaningful participation in ICAO . . . .").

15

### D. The NTSB's incidental role in post-accident family assistance does not require at-will removal of NTSB members.

Nor does the NTSB's role in post-accident family assistance require at-will removal of Board members. In 1996, Congress enacted the Aviation Disaster Family Assistance Act after hearing numerous "horror stories" from family members of passengers killed in aviation accidents. H.R. Rep. No. 104-793, at 5 (1996).[12] Family members recounted how airlines gave them only impersonal, cursory information and how, in some cases, mass burials were held without informing the deceased passengers' families. *Id.* Consistent with Congress's main concerns in enacting the Act, the NTSB's role is primarily to keep passengers and their family members informed about the crash and the NTSB's investigation. 49 U.S.C. §§ 1136(a)(1), (d)(1), (e), 1140. Keeping passengers and family members informed is simply an extension of the NTSB's responsibility to keep the public informed of "the facts and circumstances of each accident." *See id.* § 1131(e) (requiring public reports); *see also id.* § 1136(e) (requiring NTSB to ensure that passengers' families "are briefed, prior to any public briefing, about the accident, its causes, and any other findings from the investigation" and that they are "informed of and allowed to attend any public hearings and meetings of the Board about the accident"); § 1139(e) (same); § 1140 (similar).

Contrary to Defendants' suggestion, Defs.' MTD at 17, the NTSB is not like FEMA. After a disaster, FEMA directly provides monetary assistance to cover temporary housing, home repairs, car repairs, food, water, baby formula, and the like. And it helps to fund disaster recovery work done by state and local governments and non-profits. *See* FEMA, *Assistance for Housing and Other Needs* (last updated July 29, 2026), https://perma.cc/W9HF-G2W4; FEMA, *Assistance for Governments and Private Non-Profits After a Disaster* (last updated Apr. 8, 2026), https://perma.cc/GD26-KE7V. In contrast, although the NTSB designates a nonprofit such as the Red Cross to provide assistance to affected passengers and their families, the NTSB does not fund

---

[12] Congress enacted the rail passenger equivalent in 2008. Rail Safety Improvement Act of 2008, Pub. L. No. 110-432, §§ 501–502, 122 Stat. 4848, 4894–99.

16

that assistance.[13] Nor does the NTSB directly provide benefits. Such responsibilities fall on the airlines. *Compare* 49 U.S.C. § 1136(a)(2), *with id.* §§ 1136(f), 41113(b)(10)-(11) (requiring air carriers to work with the designated nonprofit "to ensure that families of passengers receive an appropriate level of services and assistance following each accident" and to "provide reasonable compensation to" the designated nonprofit for services provided), *id.* § 41113(b)(12) (requiring air carrier to assist family members "in traveling to the location of the accident and provide for the physical care of the family"), *and id.* § 41313(b)(10)-(12) (same for foreign air carriers).[14] When airlines fail to carry out these responsibilities, DOT is the agency that brings enforcement actions against them. *See* Order 2014-02-20, *In re Asiana Airlines, Inc.*, No. OST-2014-0001 (DOT Feb. 25, 2014), https://perma.cc/3XUV-WULJ (imposing civil penalty). The NTSB has no such authority.

Also, while the NTSB has "primary *Federal* responsibility for *facilitating* the recovery and identification of fatally-injured passengers," 49 U.S.C. § 1136(b) (emphases added), as Congress understood, "the actual hands-on work of recovery and identification is usually the responsibility of local authorities and medical examiners." H.R. Rep. No. 104-793, at 9; *cf.* 49 C.F.R. § 831.5(a)(6) (2025) ("The NTSB does not assume the role of a first responder agency."). The provision was merely intended to allow the NTSB to "speed" the recovery and identification of passengers "as may be necessary." H.R. Rep. No. 104-793, at 9.

As for enforcement of the statutory provisions prohibiting unsolicited attorney

---

[13] *See* H.R. Rep. No. 104-793, at 13 (estimating the Aviation Disaster Family Assistance Act would cost the federal government $750,000—the salaries of seven new NTSB staff and the cost to DOT of writing a report—without any mention of the government funding the assistance). Today, the NTSB's Transportation Disaster Assistance Division does not have its own budget line or personnel count in the NTSB's annual budget request. Along with the chief data officer, the Occupational Safety and Health Division, and various other programs and divisions, it is part of the Office of the Managing Director (which has 34 employees total). NTSB, *Fiscal Year 2027 Budget Request* 13–14, 18–21 (2026), https://perma.cc/U98C-NGMU.

[14] Rail carriers have similar responsibilities in rail passenger accidents. *Compare* 49 U.S.C. § 1139(a)(2), *with id.* § 1139(f), and *id.* § 24316(b)(10)–(11).

17

communications with passengers or family members for 45 days after an accident, 49 U.S.C. §§ 1136(g)(2), 1139(g)(2), which were enacted as part of the 1996 Act and its railroad equivalent in 2008, as discussed above, the NTSB has no independent litigation authority, and thus is powerless to seek civil penalties unless DOJ agrees to pursue it for them. *See supra* Part I.B; 49 U.S.C. §§ 1151, 1155(a).

To the extent the Court believes that this little-used enforcement power[15] (or that the 1996 Act or its railroad counterpart as a whole) is problematic, the Court should sever this provision, so that the NTSB can continue its core work of investigating accidents and making safety recommendations with its usual independence. "[W]hen confronting a constitutional flaw in a statute," courts "try to limit the solution to the problem by disregarding the problematic portions while leaving the remainder intact." *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021) (cleaned up); *id.* at 25 (taking a "tailored approach" that preserved administrative patent judges' removal protections but invalidated other portions of the statutory scheme). Although the Supreme Court in some cases has "sever[ed] the invalid removal provision," *Slaughter*, 146 S. Ct. at 2304 n.3 (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010), and *Seila L. LLC v. CFPB*, 591 U.S. 197, 233–38 (2020)); *Harris v. Bessent*, 160 F.4th 1235, 1257 (D.C. Cir. 2025), the Court has never categorically held that that is the only solution. In those prior cases, the agencies at issue, unlike the NTSB, regulated primary conduct and had expansive enforcement powers intertwined with rulemaking and adjudication powers, such that any alternative besides severing the removal provision could present difficult line-drawing exercises. *See Free Enter. Fund*, 561 U.S. at 485, 508–10 (describing Public Company Accounting Oversight Board's "expansive powers to govern an entire industry" and declining to "blue-pencil" Board's responsibilities); *Seila Law*, 591 U.S. at 206–07, 236–37 (describing CFPB's rulemaking authority and "potent enforcement powers," "coupled with [its] extensive adjudicatory authority" and

---

[15] DOJ has apparently brought suit under this provision on NTSB's behalf once in the provision's nearly 30-year existence. *See* Compl., *United States v. Collins*, No. 09-cv-6473, 2009 WL 5058813 (W.D.N.Y. Sep. 17, 2009).

pointing out that eliminating the CFPB would "trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena"). Here, in contrast, severing a discrete, later-added, and seldom-used function that is distinct from NTSB's central work of investigating accidents and recommending safety improvements would be more appropriate than severing the removal protections in § 1111(c), given Congress has thought it important to protect the nation's aviation accident investigation authority from unrestricted Presidential removal power for nearly 90 years. *See* Pl.'s MSJ at 2–3.

### E. The NTSB's appellate function weighs in favor of more, not less, independence.

Aside from conducting investigations and making safety recommendations, the NTSB also has a separate function of serving as an appellate tribunal in certain licensing and registration cases. In these appeals, the NTSB exercises no regulatory or enforcement power; it is an impartial adjudicator. *Garvey v. NTSB*, 190 F.3d 571, 573–74 (D.C. Cir. 1999). The NTSB in its adjudicatory role thus has "a unique need for 'absolute freedom from Executive interference.'" *Collins v. Yellen*, 594 U.S. 220, 250 n.18 (2021); *see also Morrison*, 487 U.S. at 691 n.30.

Defendants' primary response is to analogize the NTSB to the Merit Systems Protection Board (MSPB). Defs.' MTD at 26. But the D.C. Circuit distinguished the MSPB from "[p]urely adjudicatory agencies—ones designed to be 'an independent adjudicator' with no policymaking authority" and cited the NTSB as an example of a purely adjudicatory agency. *Harris*, 160 F.4th at 1256 (citing *Hinson v. NTSB*, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995), which described NTSB's role as "purely adjudicatory"). Moreover, the MSPB has a different constellation of functions and different relationships with other federal agencies than the NTSB does in its appellate role. Notably, unlike the NTSB, the MSPB regulates primary conduct and has independent litigating authority. *Id.* at 1254–56.[16] Also, when the MSPB decides whether employing agencies have meted

---

[16] In a stay order, the Supreme Court described the MSPB as having "considerable executive power," *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025), but the Court has also held that its interim orders are "not conclusive as to the merits." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Thus,

out appropriate discipline, it "makes its own 'discretionary judgment,' which 'is by no means' a mere legal or factual inquiry." *Id.* at 1255 (quoting *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 297 (1981)). In contrast, the NTSB must defer to the FAA's choice of sanction and can overturn it only if it "is unwarranted in law or is without justification in fact." *Pham v. NTSB*, 33 F.4th 576, 583 (D.C. Cir. 2022) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 112–13 (1946)) (finding NTSB's modification of an FAA sanction contrary to law because it did not accord appropriate deference).[17]

Defendants also contend that the CFPB and FTC were also adjudicators. Defs.' MTD at 25–26. But the NTSB is an independent adjudicator in a "split-enforcement" structure, *Hinson*, 57 F.3d at 1147 n.1, not a "unitary" agency like the CFPB and FTC, where "rulemaking, enforcement, and adjudicative powers are combined in a single administrative authority" such that the agency is both prosecutor and adjudicator. *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151 (1991) (placing FTC, SEC, and FCC in the second bucket); *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189 (2023) (FTC "houses (and by design) both prosecutorial and adjudicative activities"). Both *Slaughter* and *Seila Law* emphasized the FTC's and the CFPB's respective

_____

the only binding authority regarding the MSPB is *Harris*, where the D.C. Circuit distinguished it from the NTSB.

[17] Defendants' examples of NTSB decisions that "reject[ed]" FAA or Coast Guard decisions do not suggest otherwise. Defs.' MTD at 25. One case appears to have been decided under the misunderstanding that, after the 2012 Pilot's Bill of Rights, the NTSB was no longer required "to defer to the Administrator's choice of sanction in enforcement actions," *Dickson v. Defreitas*, NTSB Order No. EA-5906, 2021 WL 3929998, at *10 (NTSB Aug. 24, 2021), a notion that the D.C. Circuit later rejected in *Pham*, 33 F.4th at 583. Another acknowledged the requirement of "wide deference to a law judge's choice of sanction[,] absent special circumstances—such as an order that is 'obviously excessive, arbitrary, capricious, or an abuse of discretion.'" *Papp v. Ailsworth*, NTSB Order No. EM-211, 2011 WL 7141395, at *5 (NTSB Dec. 28, 2011). In that particular case, "the law judge's imposition of revocation" was "excessive, arbitrary, and capricious" because under the Coast Guard's own regulations, the maximum sanction was a 12-month suspension. *Id.* The D.C. Circuit found the third decision erroneous because the NTSB failed to give *Skidmore* deference to the Coast Guard's interpretation of its own regulations. *Collins v. NTSB*, 351 F.3d 1246, 1254 (D.C. Cir. 2003) (remanding *Collins v. Nitkin*, NTSB Order No. EM-193, 2002 WL 1727347 (NTSB July 23, 2002)).

combinations of rulemaking, enforcement, and adjudicatory powers. *Slaughter*, 146 S. Ct. at 2305; *Seila Law*, 591 U.S. at 218–19. *Harris* had a similar emphasis with respect to the NLRB and MSPB. *Harris*, 160 F.4th at 1251 (contrasting "purely adjudicatory bodies like the War Claims Commission" with "adjudication conducted by agencies with substantive rulemaking power," like the NLRB, which makes policy through adjudication); *id.* at 1256 (contrasting MSPB with "[p]urely adjudicatory agencies . . . with no policymaking authority" and citing NTSB case).

Defendants also try, but fail, to distinguish the Tax Court. Defs.' MTD at 27. While Congress labeled the Tax Court a "court" and described it as independent of the Executive Branch, the D.C. Circuit has repeatedly held that, nevertheless, the Tax Court is part of the Executive Branch. *Kuretski v. Comm'r of Internal Revenue*, 755 F.3d 929, 944 (D.C. Cir. 2014); *Crim v. Comm'r of Internal Revenue*, 66 F.4th 999, 1001 (D.C. Cir. 2023); *see also DOT v. Ass'n of Am. Railroads*, 575 U.S. 43, 51 (2015) ("Congressional pronouncements . . . are not dispositive of" an entity's status "for purposes of separation of powers analysis under the Constitution."). At bottom, both the Tax Court and NTSB provide neutral, independent fora for individuals to resolve actions initiated by enforcement agencies. *Compare, e.g.*, 49 U.S.C. § 44703(d)(1) (individual may appeal FAA denial of airman certificate to NTSB); *id.* §§ 44106(d)(1), 44709(d)(1), 44710(d)(1), (similar), *with* 26 U.S.C. §§ 6212-6214 (following IRS notice of deficiency, taxpayer may petition the Tax Court, which can redetermine the correct amount of the deficiency). Given the Supreme Court and D.C. Circuit have repeatedly recognized adjudicatory bodies are different, the NTSB's appellate function is a reason to uphold, not to destroy, the NTSB's removal protections.

\* \* \*

Because the NTSB investigates solely to make non-binding safety recommendations and its appellate function is purely adjudicatory, NTSB members' statutory removal protections are constitutional. Since Defendants do not dispute that the President violated the statute, the Court should grant summary judgment to Mr. Brown on Count I.

21

## II.    Mr. Brown has plausibly alleged a claim of intentional racial discrimination.

Defendants' arguments for dismissing Mr. Brown's Fifth Amendment race discrimination claim are equally unavailing. *See* Defs.' MTD at 28–34. Mr. Brown pleads sufficient facts to survive a motion to dismiss under the governing *McDonnell Douglas* test by identifying a comparator who was treated differently. Defendants' efforts to shoehorn Mr. Brown's allegations into the *Arlington Heights* test fail both as a matter of law and as a matter of fact. *McDonnell Douglas* is the proper standard for employment discrimination claims. But even if it were not, Mr. Brown's allegations are sufficient to survive a motion to dismiss under any standard. Further, the Defendants' claim that presidential removal decisions cannot be reviewed by courts portends a constitutional system where the President could violate individual rights without check or consequence. Our Constitution demands more.

### A.    The FAC's allegations satisfy the standards for a disparate treatment comparator claim.

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). To establish an equal protection violation, a plaintiff must establish that the defendants had a discriminatory intent. *Id.* In the context of employment discrimination, intentional discrimination cases are known as "'disparate treatment'" cases where "an individual alleges that an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985–86 (1988) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

As the Supreme Court reaffirmed last year in *Ames v. Ohio Department of Youth Services*, 605 U.S. 303, 308 (2025), the "familiar" three-step burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is used to evaluate disparate treatment claims based on circumstantial evidence at trial and summary judgment. At step one, "the plaintiff bears the 'initial burden' of 'establishing a prima facie case' by producing enough evidence to

support an inference of discriminatory motive." *Ames*, 605 U.S. at 308–09 (quoting *McDonnell Douglas*, 411 U.S. at 802). In a case where an employee claims that he was discriminated against compared to another employee (a comparator case), the elements of a prima facie case are: "(1) that [plaintiff] is a member of a protected class; (2) that [plaintiff] was similarly situated to an employee who was not a member of the protected class; and (3) that [plaintiff] and the similarly situated person were treated disparately." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). "For most plaintiffs, the first step of the *McDonnell Douglas* framework—the prima facie burden—is 'not onerous.'" *Ames*, 605 U.S. at 309 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

"If the plaintiff clears [the first step], the burden then 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 308–09 (quoting *McDonnell Douglas*, 411 U.S. at 802). "Finally, if the employer articulates such a justification, the plaintiff must then have a 'fair opportunity' to show that the stated justification 'was in fact pretext' for discrimination." *Id.* at 309 (quoting *McDonnell Douglas*, 411 U.S. at 804). To ultimately prevail, the plaintiff has to show that "unlawful discrimination was 'a factor motivating the adverse action.'" *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012) (quoting *Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008)).

Importantly, the *McDonnell Douglas* test is an evidentiary test applicable at summary judgment or trial, not a pleading requirement. *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510–11 (2002); *Brown v. Sessoms*, 774 F.3d 1016, 1022–23 (D.C. Cir. 2014). To survive a motion to dismiss, a plaintiff proceeding on a "comparator" theory need only "plead enough facts about th[e] comparators and the relevant context to allow a plausible inference that he was treated differently because of his race." *Joyner*, 140 F.4th at 530. The D.C. Circuit's analysis in *Joyner* is particularly instructive because that case, like this one, was a "comparator" racial discrimination employment case. In *Joyner*, the plaintiff was hired by a legal staffing firm to fill a temporary role at a law firm. *Id.* at 527–28. He alleged that he was treated adversely compared to other temporary staffers because of his race. *Id.* at 528. The D.C. Circuit stated that "[i]n our cases addressing motions to

dismiss . . . we have emphasized that the plaintiff's 'burden at the summary judgment stage and at trial is different and substantially more onerous than the pleading burden.'" *Id.* at 530 (quoting *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017)).

At the pleading stage, "[t]he complaint 'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Joyner*, 140 F.4th at 530 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Complaints that the D.C. Circuit has "found sufficient to proceed on a comparator theory [have] contained allegations that a comparator was similarly positioned to the plaintiff in at least some relevant respects, and included enough detail that we could plausibly infer that discrimination caused the defendant's differential treatment of the plaintiff." *Id.* at 531; *see Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116, 123–24 (D.D.C. 2023) (a complaint alleging disparate treatment that "'detailed the events leading to'" the adverse action, "'provided relevant dates,'" and "'included the' race . . . 'of at least some . . . relevant persons'" who were treated differently, "'stated claims upon which relief could be granted'" (quoting *Swierkiewicz*, 534 U.S. at 510, 514)). Conversely, the D.C. Circuit has "never required a complaint to include factual allegations showing that the comparator's circumstances are 'nearly identical' to the plaintiff's in 'all relevant aspects.'" *Joyner*, 140 F.4th at 531 (quoting *Joyner v. Morrison & Foerster LLP*, No. 20-1440, 2023 WL 6313194, at *5 (D.D.C. Sep. 27, 2023) (*vacated in part* by *Joyner*, 140 F.4th 523)). The ultimate "question is always whether there are enough facts pleaded to make it 'plausible,' as opposed to just 'speculative,' to infer that a defendant was motivated by the plaintiff's race rather than the myriad other reasons that might affect an employment decision." *Id.* at 531 (quoting *Brown*, 774 F.3d at 1023).

Here, Mr. Brown's disparate-treatment claim is pleaded as a "comparator" claim and readily satisfies the pleading standard as articulated in *Joyner* and similar cases: "As a Black person, Mr. Brown is in a protected class. His removal is an adverse employment action, and he was treated differently from similarly situated people, the other members of the Board, and particularly the white Democratic members." FAC ¶ 60; *see also* FAC ¶ 8. The FAC alleges that Mr. Brown is Black, and his comparators, Ms. Homendy and Mr. Chapman, are white. FAC ¶ 37.

24

And the FAC alleges that Mr. Brown and his comparators are similarly positioned in several relevant respects. Before his removal, Mr. Brown and his comparators were all members of the National Transportation Safety Board. FAC ¶ 37. They all gained their seats on the NTSB through the Presidential appointment and Senate confirmation process as provided by statute. 49 U.S.C. § 1111(b). Their duties as Board members are the same and provided by statute. *Id.* §§ 1101 *et seq*. Mr. Brown and his comparators are all Democrats. FAC ¶ 37. Indeed, as opposed to Mr. Brown, President Trump could have removed Mr. Chapman by appointing a successor without violating 49 U.S.C. § 1111(b) because, at the time of Mr. Brown's removal, Mr. Chapman's term had ended and he was serving as a holdover. FAC ¶ 38. These allegations more than meet the showing of alleging facts about comparators of different races that are "similarly positioned to the plaintiff in at least some relevant respects." *Joyner*, 140 F.4th at 531.

Indeed, while Mr. Brown was not required to go any further than that at the pleading stage, the FAC also includes allegations of actions and statements by President Trump and his administration that place Mr. Brown's removal in a broader context that goes beyond the NTSB. FAC ¶¶ 40–50. This includes allegations regarding: (1) the disproportionate removal of "presidentially appointed and Senate-confirmed Board members of independent multimember agencies" who are Black, FAC ¶ 40; (2) the removal of other high-level Black officials, FAC ¶ 43; (3) public statements from Mr. Trump and high government officials "indicating that he and his administration are seeking to remove people of color throughout the federal government," FAC ¶ 43, including several statements from President Trump about ending diversity, equity, and inclusion (DEI) programs that suggest a view that Black officials were likely to have been undesirable "DEI hires," FAC ¶¶ 44–47; (4) the disproportionate removal of Black officials and Black employees across the federal government FAC ¶ 50; (5) the low percentage of President Trump's Senate-approved appointees that are Black; FAC ¶ 51; and (6) the emphasis of the Trump Administration on hiring white men. FAC ¶ 49.

Although, at the pleading stage, Mr. Brown is not required to establish that any nondiscriminatory reasons Defendants might offer for Mr. Brown's removal are pretextual, these

25

allegations support the inference that Mr. Brown was in fact removed instead of Ms. Homendy or Mr. Chapman because of his race.

### B. Mr. Brown has stated a proper claim under the proper legal standard.

Defendants argue that the *McDonnell Douglas* test is not applicable and that Mr. Brown's race discrimination claim must instead by analyzed under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Defs.' MTD at 35, 37. But *McDonnell Douglas* is the standard framework for assessing constitutional employment discrimination claims. To the extent Defendants dispute the sufficiency of the FAC's allegations under that framework, their arguments are either irrelevant or premature at the motion to dismiss stage. Finally, even if *Arlington Heights* were the controlling framework, Defendants fail to apply it faithfully. The allegations in the FAC state a claim for race discrimination even under that standard.

### 1. *McDonnell Douglas is the proper standard for Mr. Brown's claim.*

Defendants begin by arguing that the *McDonnell Douglas* test applies only to statutory contexts like Title VII and 42 U.S.C. § 1981 claims, but "not to equal protection claims brought directly under the Fifth Amendment." Defs.' MTD at 35. Even overlooking that Defendants do not cite a single case directly affirming this proposition, the logic of this argument does not hold up.

Courts, including in the D.C. Circuit, have routinely applied the *McDonnell Douglas* framework to assess the validity of equal protection claims. *See, e.g.*, *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168, 186 (D.D.C. 2025); *Jo v. Dist. of Columbia*, 582 F. Supp. 2d 51, 60 (D.D.C. 2008); *see also Oates v. Dist. of Columbia*, 824 F.2d 87, 90 (D.C. Cir. 1987).[18] That makes sense. Equal

---

[18] *See, e.g.*, *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73–74 (2d Cir. 2015) ("[W]e evaluate . . . Title VII and Equal Protection claims under the *McDonnell Douglas* framework."); *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018) ("In order to establish a violation of the Equal Protection Clause in the employment context, a plaintiff must prove a racially discriminatory purpose or motive . . . . In the absence of direct evidence of intentional discrimination, under the Title VII framework, we apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*."); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) ("[T]he showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors

protection claims assess whether someone was intentionally treated differently from those similarly situated because of a protected characteristic. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The *McDonnell Douglas* comparator test assesses the same thing. *Sessoms*, 774 F.3d at 1022. And it uses a framework that enables courts to "progressively . . . sharpen the inquiry into the elusive factual question of intentional discrimination." *Burdine*, 450 U.S. at 255 n.8.

Defendants stress that the constitutional claims addressed in those cases relied on statutory causes of action, like § 1983 or § 1981, arguing that these statutes "provide[] for broad remedies for certain violations of civil rights." Defs.' MTD at 36. But the substantive constitutional protection is the same whether a plaintiff proceeds under one of those statutes or under the Constitution directly, and there is accordingly no reason why the framework for analyzing an alleged violation should differ. The Supreme Court has been clear that § 1983 is not itself "a source of substantive rights," but instead "a method for vindicating" existing rights, like equal protection. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).[19] Section 1981, meanwhile, closely parallels the Fourteenth Amendment and requires proof of intentional discrimination—unsurprisingly, since the law originated from the same Congress as the Amendment, and members saw "the statute and the Amendment [as] expressions of the same general congressional policy" and "directed against the same evils." *Gen Bldg.*

---

that which must be made to recover on an equal protection claim under section 1983 . . . [that a plaintiff] was the victim of intentional or purposeful discrimination"); *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1014 (8th Cir. 2013) ("[C]ourts apply the *McDonnell Douglas* burden-shifting analysis to claims of employment discrimination under the Equal Protection Clause."); *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) (while the *McDonnell Douglas* framework "originated in cases interpreting Title VII . . . its use has since expanded to other discrimination statutes and to constitutional equal protection"); *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018) ("Employment discrimination claims against state actors for violation of the Equal Protection Clause . . . are subject to the same standards of proof and use the same analytical framework as discrimination claims brought under Title VII.").

[19] Indeed, plaintiffs raising constitutional race discrimination claims are not even required to invoke § 1983 to survive a motion to dismiss on their complaint. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014); *Sessoms*, 774 F.3d at 1022. Neither is Mr. Brown.

*Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 384–85, 389–91 (1982) (quoting, in part, *Hurd v. Hodge*, 334 U.S. 24, 32–33 (1948)). What's more, Defendants' argument confuses the difference between an evidentiary test, like *McDonnell Douglas*, which courts use to help determine discriminatory intent, and the remedies available for such a claim if proven. Evidentiary tests like *McDonnell Douglas* are not about identifying a remedy but are merely tools—"sensible, orderly way[s] to evaluate the evidence"—that judges can use to help assess the "critical question of discrimination." *Ames*, 605 U.S. at 308 n.2 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).[20] And there is no reason why a test that is appropriate to prove discriminatory intent under a statute would suddenly become inappropriate when used to make the same determination under the Constitution. No cases Defendants cite support that proposition, and for good reason.

Defendants note that they have been unable to identify other cases where courts applied *McDonnell Douglas* to assess a constitutional claim alone, as opposed to constitutional and statutory claims brought together. Defs.' MTD at 35. But that reflects a doctrinal quirk concerning the claims available to different categories of plaintiffs, not a limitation on when *McDonnell Douglas* applies. Employees suing private employers for intentional discrimination bring statutory claims because private conduct is not regulated by the Equal Protection Clause. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 171–72 (1972). State employees can, and do, bring both statutory and constitutional employment discrimination claims together. *See, e.g.*, *Hager*, 735 F.3d at 1012. For most federal employees, Title VII is the exclusive judicial remedy for employment discrimination claims. *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976). But this limitation does not extend to Senate-confirmed appointees, like Mr. Brown, who are part of a narrow class

---

[20] Limits on implied damages remedies against federal officers for constitutional violations are thus irrelevant here, where the dispute concerns the framework for determining whether a violation occurred in the first place. *Cf.* Defs.' MTD at 37 (citing *Zigler v. Abbasi*, 582 U.S. 120 (2017), and *Egbert v. Boule*, 596 U.S. 482, 491 (2022)). In any event, federal employees proceeding outside of Title VII can seek damages under a stand-alone constitutional claim. *Davis v. Passman*, 442 U.S. 228, 242–43, 248 (1979).

of federal officials not covered by Title VII at all. *See* 42 U.S.C. § 2000e-16(a); 3 U.S.C. § 411(c)(1)(A). Meanwhile, federal employees have access to neither § 1983, which by its terms applies only to state law, *see Lyles v. Hughes*, 83 F. Supp. 3d 315, 324 (D.D.C. 2015), nor § 1981, which similarly does not reach actions taken under color of federal law, *see DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 291 (D.D.C. 2012) (collecting cases). Plaintiffs like Mr. Brown are thus in the rare class of plaintiffs who can bring only constitutional employment-discrimination claims, not Title VII or other statutory claims. The reason why so few cases apply *McDonnell Douglas* to stand-alone constitutional claims is thus simply that few plaintiffs bring stand-alone constitutional claims without a corresponding statutory claim.

Contrary to Defendants' contention, Defs.' MTD at 37, the fact that all race discrimination claims brought under the Constitution require proof of discriminatory intent does not mean that all such claims must be evaluated under the *Arlington Heights* test. *McDonnell Douglas* and *Arlington Heights* both require an ultimate finding that invidious discriminatory purpose was a motivating factor. *See Arlington Heights*, 429 U.S. at 266; *Ponce*, 679 F.3d at 844. Both are approaches courts can take to identifying discriminatory intent where direct evidence is missing. *See Ballou*, 29 F.4th at 424–25; *Lewis v. City of Union City*, 918 F.3d 1213, 1217, 1220 n.6 (11th Cir. 2019) (noting the *McDonnell Douglas* comparator test is "one" of a "variety of ways" a plaintiff can survive a motion to dismiss); *Jones v. Trailways Corp.*, 477 F. Supp. 642, 646 (D.D.C. 1979). The major difference is that *Arlington Heights* was a case dealing with a discriminatory policy, 429 U.S. at 257–60, and the test it articulated is generally applied to assess whether a facially neutral law or policy was enacted or applied with a discriminatory intent, *see, e.g.*, *Omnipoint Corp. v. FCC*, 78 F.3d 620, 634 (D.C. Cir. 1996). Indeed, the cases Defendants cite that applied the *Arlington Heights* test exclusively deal with policy decisions that affect wider populations. Defs.' MTD at 38. *McDonnell Douglas*, in contrast, is an employment discrimination case brought by an individual, and the test it articulated is tailored to that context, 411 U.S. at 800–07. Accordingly, as recently reiterated in *Ames*, the Supreme Court has applied *McDonnell Douglas* consistently in comparator employment discrimination cases rather than the *Arlington Heights* factors. Lower

29

federal courts have likewise looked to *McDonnell Douglas* in comparator employment discrimination cases, including cases brought under the Fifth Amendment, *see, e.g.*, *Jiggetts*, 774 F. Supp. 3d at 186, and cases brought by federal employees, *see, e.g.*, *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Indeed, DOJ's own legal manual on Title VI claims, which adopts "the constitutional analysis of intentional discrimination," lists the *Arlington Heights* and *McDonnell Douglas* test as interchangeable methods of circumstantial proof of discriminatory intent, while noting that the *Arlington Heights* test is "most commonly applied in cases alleging discrimination against a group," and the *McDonnell Douglas* test is "most commonly applied in cases alleging discrimination in individual instances." *Title VI Legal Manual (Updated): Section VI—Proving Discrimination—Intentional Discrimination*, DOJ, https://perma.cc/C8MK-34R8 (last accessed Aug. 1, 2026).

Finally, as a last resort, Defendants argue that the *McDonnell Douglas* test is at odds with *Slaughter* because it "impermissibl[y] burdens" the President's "removal powers and decision making." Defs.' MTD at 38. As explained below, however, the President has no such power to remove officials on discriminatory grounds that violate the Constitution. *See infra* Part III.A. And there is little reason to believe that the *McDonnell Douglas* test will not sufficiently filter out unmeritorious claims. Plaintiffs bringing race discrimination claims still must plead enough facts to allow for a "plausible inference that [they were] treated differently because of [their] race." *Joyner*, 140 F.4th at 530. Further, as the Supreme Court articulated in *Swierkiewicz*, courts can "very easily" remove unwarranted discrimination claims in later stages of litigation, because "[t]he provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective." 534 U.S. at 512–13 (quoting 5 Wright & Miller, Federal Practice and Procedure § 1202 (2d ed. 1990)). Finally, courts have been relying on the *McDonnell Douglas* standard to effectively filter employment discrimination claims for decades, without grave consequence, including in federal employee cases. *See Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999), *overruled on other grounds* by *Chambers v. D.C.*, 35 F.4th 870 (D.C. Cir. 2022) (listing cases). Concern about the *McDonnell Douglas* standard opening the floodgates for litigation have

30

been frequently voiced and yet rarely borne out.[21]

### 2. Defendants' efforts to discount Mr. Brown's evidence of discrimination are unavailing.

Because Defendants do not apply the *McDonnell Douglas* framework, very little of their motion bears on what a plaintiff must allege to plead a plausible comparator claim under that framework. They devote only one paragraph to addressing the adequacy of Mr. Brown's allegations comparing his removal to similarly situated members of the NTSB, focusing on the pre-NTSB careers of Mr. Brown, Ms. Homendy, and Mr. Chapman to suggest that they are not proper comparators for Mr. Brown. Defs.' MTD at 34. In doing so, Defendants improperly introduce allegations outside the complaint. *Id.* Moreover, the proper focus in determining who is an appropriate comparator is their performance in the current position, not their experience in previous positions. *See also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002).[22] Defendants note that President Trump originally appointed Ms. Homendy and Mr. Chapman whereas President Biden appointed Mr. Brown, but they do not explain why that should matter as to whether that makes them comparators. In any event, those arguments all go to the second step of *McDonnell Douglas*—the employer's burden to identify "legitimate, nondiscriminatory reason[s] for the employee's rejection," *Ames*, 605 U.S. at 308–09 (quoting *McDonnell Douglas*, 411 U.S. at 802)—which does not come into play at the motion to dismiss stage. Finally, Defendants point to the later removal of J. Todd Inman, a white Republican, from the NTSB as

---

[21] Defendants' hypothetical about U.S. Attorneys does little to advance their argument, not only because U.S. Attorneys from different districts are likely not viable comparators, *see Carey v. Fed. Express Corp.*, 519 F. App'x 772, 776 (3d Cir. 2013) (noting an employee working at a different regional office was likely an insufficient comparator), but also because Defendants provide no justification in law or logic for why the President would have to remove "*all* U.S. Attorneys at once" to avoid such claims. Defs.' MTD at 38 (emphasis added). The comparator test for employment discrimination claims requires no such approach.

[22] Defendants similarly rely improperly on allegations outside the FAC in discussing Mr. DeLeeuw, who has usurped Mr. Brown's seat on the NTSB. Defs.' MTD at 34. In any event, the sufficiency of a complaint on a motion to dismiss turns on whether it plausibly alleges that a similarly situated comparator was treated differently, *see Joyner*, 140 F.4th at 530–31, not on the supposed status and qualifications of the plaintiff's replacement.

evidence that the President did not "single out Brown for removal." Defs.' MTD at 34. But post-hoc non-discriminatory actions do nothing to remediate claims of racial discrimination, *see Teamsters*, 431 U.S. at 342 (affirming that later non-discriminatory efforts do "not erase . . . previous illegal conduct"), and this argument again relies on allegations beyond the complaint.[23] Thus, Defendants' limited arguments relating to comparators do nothing to diminish Mr. Brown's showing that Ms. Homendy and Mr. Chapman are similarly situated to him for the purposes of overcoming a motion to dismiss.

Defendants devote several pages, Defs.' MTD at 29–33, to addressing the FAC's allegations regarding the Trump Administration's disproportionate removal of Black independent agency board members compared to white independent agency board members. Defendants critique these allegations because they claim that "evidence of disparate outcomes, without more" rarely demonstrates discriminatory intent. *Id.* at 29. These allegations, however, provide substantial support to the inference that Mr. Brown was removed because of his race—they point to an administration consistently and disproportionately targeting people of color and vestiges of diversity. But Mr. Brown also does not rely on these allegations "without more." As discussed above, the FAC plausibly alleges that Mr. Brown was treated differently from other members of the NTSB based on his race and includes allegations specific to the NTSB and similarly situated NTSB members who were not removed—i.e., precisely the allegations required under *Joyner*. No more is required at this stage. The FAC's allegations regarding the disproportionate removal of Black members of independent agencies provide context to the NTSB-specific allegations and support the inference of intentional racial discrimination. In so far as additional evidence points to

---

[23] Mr. Inman's example highlights the problems with Defendants' reliance on allegations beyond the complaint, since the White House has claimed that Mr. Inman was removed based on "highly concerning reports of inappropriate alcohol use on the job, harassment of staff, misuse of government resources, and failure to attend at least half of NTSB meetings." *See* Chris Marquette, *White House Says NTSB Member Was Fired For Inappropriate Alcohol Use, Harassment*, Politico (Mar. 3, 2026, 12:01 PM EDT), https://perma.cc/547V-ZTEQ. That Mr. Brown was fired without any such allegations shows he was not similarly situated to Mr. Inman and highlights his unusual treatment.

a "general culture of racial inequity," it serves only to push Mr. Brown's claim "farther over the plausibility threshold." *Joyner*, 140 F.4th at 532 (internal citation omitted). While additional evidence that goes beyond a prima facie showing is helpful for "strengthen[ing a] discrimination complaint," it is also "not required at the pleading stage." *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 622–23 (D.C. Cir. 2023) (quoting *Nanko Shipping*, 850 F.3d at 467).

Similarly, because Mr. Brown's claim relies on a comparator theory under the *McDonnell Douglas* disparate-treatment framework—not on a showing of statistical disparities—Defendants' discussion of the statistical showings made in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), *see* Defs.' MTD at 29–33, are irrelevant.[24]

Defendants also introduce allegations that President Trump has removed white independent agency commissioners and has appointed some Black officials in agencies other than the NTSB. Defs.' MTD at 32–33. These allegations are not germane in determining whether Mr. Brown has adequately pled a comparator employment discrimination claim. To the extent they are relevant, it would be at a later stage of the case in a potential effort to counter Plaintiffs' evidence regarding the disproportionate removal of Black officials outside of the NTSB.

The same holds true with respect to the FAC's other non-NTSB specific allegations, which Defendants characterize as a "constellation of discrete circumstantial facts." Defs.' MTD at 33. These include allegations regarding President Trump's hostility to diversity, equity, and inclusion initiatives; his firing of Black officials associated with DEI; the Trump Administration's emphasis on hiring white men, as reflected in materials produced by the Department of Labor; the Trump

---

[24] Even taken at face value, the Defendants' arguments about statistical proofs miss the mark. The *Gomillion* and *Yick Wo* tests are meant to assess racial discrimination claims that rely solely on statistical evidence for proof of intent, *see Arlington Heights*, 429 U.S. at 266 (noting the *Yick Wo/Gomillion* standard applies only where "impact alone" can prove discriminatory intent)— something Defendants' own case citations affirm, *see* Defs.' MTD at 31 n.11 (quoting *Alston v. City of Madison*, 853 F.3d 901, 908 (7th Cir. 2017), affirming that *Yick Wo* and *Gomillion* apply when "statistics alone" are "enough to prove" disparate treatment). But, again, Mr. Brown's claim does not rest on the disparities he highlights, which serve instead as one factor among many that push his already sufficient comparator claim "farther over the plausibility threshold." *See Joyner*, 140 F.4th at 532.

Administration's disproportionate firing of Black employees; and the miniscule percentage of Trump appointees that are Black. Defs.' MTD at 33. Defendants contend that these allegations should be disregarded because, "[u]ltimately, these facts are insufficient, even taken as true," to establish an intentional discrimination claim. Defs.' MTD at 33. But again, the FAC does not rely on those allegations alone. Mr. Brown plausibly alleges that he is Black and was treated differently from his similarly situated white colleagues on the NTSB, and those allegations are sufficient to survive a motion to dismiss.

Defendants' efforts to dispute whether President Trump and his administration are in fact hostile to Black employees and to diversity, equity, and inclusion principles are premature and would (if true) be relevant only to issues at the later stages of the case, such as whether any nondiscriminatory explanations Defendants might offer for Mr. Brown's removal are pretextual.

### 3. Mr. Brown's claim would still succeed under the *Arlington Heights* framework.

Finally, even if the *Arlington Heights* framework applied, the FAC would survive at the pleading stage. The non-exhaustive *Arlington Heights* factors include (1) "whether" the "impact of the official action . . . 'bears more heavily on one race than another,'" which "may provide an important starting point"; (2) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) the sequence of events leading to the decision; (4) procedural and substantive departures from the norm; and (5) the legislative and administrative history. *Arlington Heights*, 429 U.S. at 266–68 (quoting *Davis*, 426 U.S. at 242). Defendants make little attempt to apply the *Arlington Heights* factors to the allegations in this case—perhaps because, even under their preferred standard, Mr. Brown's claims are sufficient to survive a Motion to Dismiss.

Indeed, the allegations of the FAC in fact address several of the *Arlington Heights* factors, beginning with the important starting point that the President's decision had a racial impact. FAC ¶¶ 37–38. Additionally, the FAC alleges that Mr. Brown's removal was made in the context of the President's having removed other Black officials and the administration's having taken actions

34

and made statements that could be viewed as disadvantageous to Black employees. FAC ¶¶ 41–51. Moreover, the FAC alleges that Mr. Brown's removal was both a substantive and procedural departure from the norm: Mr. Brown was the first NTSB member removed from the Board in its history, and his removal contravened the NTSB statute. FAC ¶¶ 39, 54. These allegations are sufficient to state a claim for intentional discrimination at this stage under any applicable standard.

## III.     Mr. Brown's Fifth Amendment claim is legally cognizable

Defendants' alternative argument, that Mr. Brown lacks a cognizable Fifth Amendment claim, asks this Court to declare that a President can violate the Constitution without any judicial review or accountability when that violation occurs in the exercise of the President's core constitutional powers. Such a rule cannot be, is not, and has never been, this country's law.

### A.  The President's removal decisions can be reviewed by courts for compliance with the Constitution.

Defendants begin by arguing that removal decisions fall within the President's "conclusive and preclusive" authority and thus cannot be "reviewed by the courts" even to ensure compliance with the Constitution. Defs.' MTD at 39 (citing *Trump v. United States*, 603 U.S. 593, 620–21 (2024) (quoting *Myers v. United States*, 272 U.S. 52, 106 (1926))). Under this theory, any removal decision, no matter how discriminatory or otherwise unconstitutional, could never be the basis for a cognizable claim. This argument fails across multiple fronts.

The Supreme Court has repeatedly underscored that "[t]he President . . . does not 'stand exempt from the general provisions of the [C]onstitution,'" including those preserving individual rights. *Trump v. Vance*, 591 U.S. 786, 795 (2020) (quoting *United States v. Burr*, 25 F. Cas. 30, 33–34 (C.C.D. Va. 1807) (No. 14,692d)). And the Court has long held that "when the President takes official action, [courts] ha[ve] the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("[T]he President's actions may . . . be reviewed for constitutionality."). This precept was reaffirmed by the Supreme Court's ruling in *Trump v. United States*, with the Court concluding that when a President exercises authority beyond the law, "courts may say so." 603

35

U.S. at 608.

This principle does not change when the President exercises a "conclusive and preclusive" power. "Conclusive and preclusive" powers, as Justice Jackson originally described them, are those that preclude "*Congress* from acting upon the subject." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring) (emphasis added). They mark a point on the constitutional equilibrium between Congress and the President, *id.*; *see Trump v. United States*, 603 U.S. at 607—not a sphere in which the President can exercise "authority without law," *id.* at 608 (quoting *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring). Courts thus can and do review exercises of core executive powers for compliance with the Constitution. In *Trump v. Hawaii*, the Supreme Court considered a constitutional challenge to a presidential proclamation imposing nationality-based entry restrictions—a policy that fell "well within executive authority"—that the plaintiffs claimed was motivated by invidious discrimination. 585 U.S. 667, 710 (2018). Although the Court concluded that the plaintiffs were not likely to succeed on the merits of their claim, it made clear that a President engaging in disparate treatment based on race violates the Constitution, even when exercising a core executive power. *Id.* (overruling *Korematsu v. United States*, 323 U.S. 214 (1944)). The Court stated for example that "the forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority," and "'has no place in law under the Constitution.'" *Id.* at 710 (quoting *Korematsu*, 323 U.S. at 248 (Jackson, J., dissenting)). Courts have similarly reviewed other exercises of "plenary" presidential powers, like the pardon power, and consistently find that such acts are exempt from judicial review only insofar as their use "does not otherwise offend the Constitution." *See Schick v. Reed*, 419 U.S. 256, 266 (1974); *Rosemond v. Hudgins*, 92 F.4th 518, 525, 526 (4th Cir. 2024); *Andrews v. Warden*, 958 F.3d 1072, 1076 (11th Cir. 2020). Defendants cite no decision holding that the removal power stands alone and apart in this regard, and they offer no reason why it should.

*Slaughter* does nothing to change this foundational principle. In holding that "Congress [cannot] place any limits on the President's power to remove" officers exercising executive power,

36

146 S. Ct. at 2307, the Court readjusted the balance of powers between Congress and the President but did nothing to imply the President's removal power is exempt from limits imposed by the Constitution itself. To the contrary, citing seminal decisions enforcing limits on presidential power, the Court reaffirmed in *Slaughter* that "[the] President is not all powerful—not by any means," *id.* at 2310 (citing *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866); *Youngstown*, 343 U.S. 579; and *United States v. Nixon*, 418 U.S. 683 (1974)). And on the very same day as it decided *Slaughter*, the Court held in *Trump v. Cook* that where legally valid limits constrain the President's removal power, courts can review and remedy unlawful firings. *See* 146 S. Ct. 2234, 2250–51 (2026).

It is undeniable that the Constitution imposes one such enforceable limit. The Court in *Slaughter* relied heavily on the first Congress's debates on executive authority, when James Madison's view that removal is an exclusive presidential power won the day. *Slaughter*, 146 S. Ct. at 2296 (citing 1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834) (statement of Rep. Madison)). But as the Court explained, that debate and its resolution focused entirely on whether Congress should have any role in or control over the removal power. *Id.* at 2295–96. None of the competing camps suggested the removal power was unlimited even by the Constitution itself. *Id.* To the contrary, even while pressing the strongest version of exclusive presidential control, Madison simultaneously urged Congress to pass the Bill of Rights because it was necessary not only to "circumscribe[]" the federal government's power but also to protect against "abuse" of the "discretionary powers" left to each branch. 1 Annals of Cong. 455 (1789) (Joseph Gales ed., 1834) (statement of Rep. Madison). "[T]he great object in view [in passing the Bill of Rights] is to limit and qualify the powers of Government, by excepting out of the grant of power those cases in which the Government ought not to act, or to act only in a particular mode." *Id.* at 454 (statement of Rep. Madison). The *Slaughter* Court adopted Madison's view of the removal power as exclusive to the President. It did not, in doing so, reject Madison's equally foundational view that even exclusive powers are not unlimited ones. Defendants respond that because *Slaughter* found the removal power to be a "corollary of the Constitution's design," its exercise must lie beyond court review. *See* Defs.' MTD at 39 (quoting *Slaughter*, 146 S. Ct. at 2295). But a power that flows from the

37

constitutional design is also bound by it. A Constitution that explicitly safeguards the free exercise of religion, for example, cannot be read at the same time, as Defendants would have it, to impliedly empower the President to remove all executive officers who practice Catholicism. The same is true of the Constitution's guarantee of equal protection.

Contrary to Defendants' suggestion, allowing judicial review of the President's exercise of core Article II powers for compliance with the Constitution would not lead to intolerable consequences in the context of the appointments power. Defs.' MTD at 39–40. According to Defendants, allowing courts to review a President's appointment of principal officers for race- and sex-based discrimination would mean that past Presidents' efforts to create diverse and representative cabinets would be subject to claims that they were "trampling the Bill of Rights in broad daylight." Defs.' MTD at 42. But the process of appointing officers is different from removing officers, and exercising the appointment power is far less likely to transgress constitutional limits. When the President removes an officer, he unilaterally takes adverse action against a specific person; and if that action is based on the removed officer's race, that would give rise to a constitutional violation. In contrast, the process of assembling a cabinet is fundamentally different. Even assuming that publicly promoting the goal of a diverse and representative executive branch could be relevant context for supporting a discrimination claim as Defendants suggest, Defs.' MTD at 42, those statements by themselves would not constitute unconstitutional discrimination in the absence of an adverse action being taken against a particular person or persons because of race. And the appointment context does not clearly lend itself to such constitutional concerns unless (at a minimum) particular candidates could show that they would have instead been selected over other potential nominees but for their race. Defendants cite the uncontroversial propositions that people of all races and sexes are protected from intentional discrimination, *see* Defs.' MTD at 39–40 (citing *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023); *United States v. Virginia*, 518 U.S. 515, 531–34 (1996)), but those cases do not suggest that efforts to create diverse presidential cabinets, absent direct discrimination against particular individuals, violate the Fifth Amendment. And they

38

certainly do not suggest that subjecting the exercise of the appointments power to constitutional review in the event unconstitutional discrimination did occur would be particularly problematic.

To the contrary, the implications of Defendants' argument are far more unsettling than Mr. Brown's. Defendants' view, if accepted, would imply that the President is immune from judicial review or accountability for any violation of constitutional rights committed through the exercise of any Article II power—a precept that not only contradicts the Supreme Court's own holdings that courts can intervene when the President violates individual rights, see *Hawaii*, 585 U.S. at 710, but also flouts the foundational ideal that no President is "above the law," *United States v. Nixon*, 418 U.S. 683, 715 (1974); *see Youngstown*, 343 U.S. at 646 (Jackson, J., concurring) ("No penance would ever expiate the sin against free government of holding that a President can escape control of executive powers by law through assuming his military role.").

**B. Courts can reasonably assess a President's intent in removal decisions.**

Defendants' concern that courts should be "wary" of inquiring into the President's intent when making a removal decision does not warrant the conclusion that the Constitution simply should not apply. Defs.' MTD at 42. In *Cook*, the Supreme Court expressly affirmed that courts have a role to play in assessing the validity of Presidential removals—even when that inquiry extends into the reasons or cause for the removal. *See Cook*, 146 S. Ct. at 2246–48. Defendants' argument seeks to give the President the very same "free hand" that *Cook* rejected. *Id.* at 2248.

Defendants' speculation about testimony being required from the President is premature. Defs.' MTD at 42. A plaintiff can prove motive through a range of circumstantial and direct evidence and is not required to show direct statements by the decisionmaker. *See Ames*, 605 U.S. at 306 (writing that *McDonnell Douglas* claims "rest on circumstantial evidence"); *Aikens*, 460 U.S. at 714 n.3 ("As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence. The trier of fact should consider all the evidence, giving it whatever weight and credence it deserves."). In *McCreary County v. ACLU of Kentucky*, for example, the Supreme Court, in reviewing a county's efforts to display the ten commandments in their courthouse, found that

39

courts are capable of looking to "readily discoverable fact" and available context to discern why the government acted the way it did, without engaging in any "psychoanalysis of [the actor's] heart of hearts." 545 U.S. 844, 862, 866 (2005). Here, if permitted to proceed, Mr. Brown would initially seek only limited discovery, narrowly cabined to information relevant to his claims, such as interrogatories directed to the NTSB defendants seeking the reason for Mr. Brown's removal and any evidence of purported insufficiencies in his performance or misalignment with the President's policy goals.

What's more, Defendants themselves point to the very legal structure that would prevent discovery from improperly invading the interests and duties of the President: privilege. Defs.' MTD at 42. If discovery proceeds to the point where Mr. Brown's requests are met with assertions of privilege, this Court can assess executive privilege, as other courts have done, to ensure that discovery is properly limited. *Nixon*, 418 U.S. at 707 (concluding that while the "the legitimate needs of the judicial process may outweigh Presidential privilege," courts must "resolve those competing interests in a manner that preserves the essential functions of each branch"). Questions about the scope and details of specific discovery requests are better reserved for a later stage of litigation.

Defendants argue that judicial inquiries into the President's motives are improper, citing *Trump v. Hawaii*, 585 U.S. 667 (2018), and *Mullin v. Doe*, 146 S. Ct. 2121 (2026). Defs.' MTD at 42. But the Court was clear in its ruling in *Hawaii*, which assessed the propriety of relying on President Trump's public statements to determine if he acted with animus in passing his "Muslim Ban," that even in the sensitive context of foreign affairs and national security, the Court could review the President's public statements—along with other circumstantial and extrinsic evidence—to determine if he had acted with impermissible animus. 585 U.S. at 704–05.

*Mullin* likewise does not foreclose inquiry into the President's intent. That case simply held that the plaintiffs were unlikely to succeed on their claim, on grounds that are readily distinguishable from this case. There, the plaintiffs brought an equal protection claim challenging the revocation of Temporary Protected Status (TPS) for Haitian nationals. The claim relied heavily

40

on public statements by the President and the Secretary of Homeland Security denigrating Haiti and its people. *Mullin*, 146 S. Ct. at 2137–40. At the outset, in reversing a preliminary injunction, the Court emphasized the "important factor" that the case arose in "the immigration context." *Id.* at 2138. In that context, in which race, ethnicity, and policy are sometimes inextricably linked, the Court concluded that the President's and Secretary's public statements "in substance all expressed policy views that could rest on race-neutral justifications." *Id.* No such context is present here. Moreover, in *Mullin*'s procedural posture, it was appropriate for the Court, in assessing whether the plaintiffs had established a substantial likelihood of success on the merits warranting interim relief, to consider whether the termination of TPS status could be justified by race-neutral explanations. Indeed, the Court's decision rested largely on its finding that the defendants had "identif[ied] a strong, race-neutral explanation" and the plaintiffs were therefore unlikely to prove that race was a motivating factor. *Id.* at 2138–40. Here, in contrast, such an inquiry is improper at the motion-to-dismiss stage. *See supra* Part II.B.2. Moreover, in *Mullin*, there were no similarly situated comparators—*i.e.*, there was no predominantly white European nation with TPS designations that could be compared against the treatment of other TPS-designated nationalities, like Haitians. *Id.* at 2139–40. Here, in contrast, not only are there clear comparators to Mr. Brown, but the comparisons are damning: Mr. Brown was removed while his white counterparts, including one with an expired term, were kept in place. Meanwhile, the majority of independent commission heads are white individuals while Black independent commission heads have been removed at a disproportionate rate. *See supra* at 5, 25. Nothing in *Mullin* or *Hawaii* precludes judicial consideration of those circumstances as indicia of invidious discrimination.

### C. Courts, not the Senate, are the proper forum for reviewing removal decisions.

Finally, Defendants cite no support for their assertion that the Senate provides the only proper forum for checking unconstitutional presidential removals. Defs.' MTD at 43. But their argument highlights the very difference between appointments and removals that makes court review essential. For while there is an explicit constitutional provision balancing the power of

appointment between the President (who nominates) and the Senate (which confirms), U.S. Const. art. II, § 2, cl. 2, there is no constitutional provision regarding the removal power. The Senate cannot block removals the same way it can block appointments. *See Myers*, 272 U.S. at 107, 176 (finding law requiring Senate advice and consent prior to presidential removals unconstitutional). Instead, courts are the only body that can ensure the President exercises his removal powers within the bounds of constitutional limits. Courts are empowered, in a way that the Senate is not, to return improperly removed officials to their office through mandamus, injunctive relief, or the writ of quo warranto. *See Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023); *see also Delgado v. Chavez*, 140 U.S. 586, 590 (1891). "The law does not require" that "a court . . . [simply] wait, and perhaps award backpay later . . . if the court holds that [the President] broke the law" in removing someone. *Cook*, 146 S. Ct. at 2250. And it remains the sole province of the courts to authoritatively say "what the law is." *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The tool that Defendants claim the Senate does have—the ability to refuse to appoint a replacement for an improperly removed officer, Defs.' MTD at 43—does nothing to prevent an illegal removal. Our Constitution allows, and requires, more.

## IV.   Mr. Brown is entitled to a remedy for his unlawful removal.

In *Cook*, the Supreme Court emphatically rejected the government's assertion that courts are powerless to afford any remedy but backpay for an unlawful removal. 146 S. Ct. at 2250. This Court should likewise reject Defendants' view that even if Mr. Brown prevails on the merits, he should nonetheless be denied relief. Defs.' MTD at 46. If the President violated a constitutionally valid statute or violated the Constitution itself, Mr. Brown is entitled to a remedy.

### A.  The Court should grant a writ of mandamus.

The D.C. Circuit's predecessor long ago recognized that mandamus "is the most adequate remedy" to restore the rights of an individual whose removal from an office was illegal and void. *Kalbfus v. Siddons*, 42 App. D.C. 310, 321 (D.C. Cir. 1914). That remains true today, as the Supreme Court recently underscored in observing that courts of law have determined title to public

office through mandamus or quo warranto. *Cook*, 146 S. Ct. at 2250.

Defendants' arguments against mandamus are unpersuasive. They claim the President does not owe Mr. Brown any clear nondiscretionary duty and that selecting the leader of an executive branch agency is not a ministerial task. Defs.' MTD at 50. But that position flatly contradicts *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (holding the President's duty to comply with statutory removal restrictions "is ministerial and not discretionary"). Defendants do not address *Swan* at all. Moreover, as Defendants point out (Defs.' MTD at 50), several district courts have held that removed officials were owed a clear nondiscretionary duty and that restoring them to their positions would be a ministerial task but stopped short of issuing a writ of mandamus only because they ordered injunctive relief instead. *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1, 47–48 (D.D.C. 2025); *Harris v. Bessent*, 775 F. Supp. 3d 164, 188 (D.D.C. 2025); *Wilcox v. Trump*, 775 F. Supp. 3d 215, 237 n.22 (D.D.C. 2025). Although the injunctions in those cases were subsequently stayed, none of the stay orders (nor any subsequent merits decisions) addressed the mandamus issue or cast any doubt on the district courts' treatment of that issue. *See Wilcox*, 145 S. Ct. 1415; *Harris*, 160 F.4th 1235; *Trump v. Slaughter*, 222 L. Ed. 2d 1230 (Sep. 8, 2025); *Slaughter*, 146 S. Ct. 2283; *LeBlanc v. United States Priv. & C.L. Oversight Bd.*, No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025).

Defendants also argue that back pay is an adequate alternative remedy, Defs.' MTD at 50, but that again disregards *Swan*, which makes clear that availability of back pay is not an absolute bar to mandamus. In *Swan*, the D.C. Circuit found all three requirements for mandamus jurisdiction met, including that there was no other adequate remedy, even though the government had argued that Swan could seek back pay. 100 F.3d at 977 n.1; Br. of Appellee, *Swan*, 1996 WL 34482875, at *20.

The Court should follow *Kalbfus*, *Swan*, and *Cook* and grant mandamus relief.

### B. Mr. Brown's quo warranto petition should not be dismissed.

As noted, in *Kalbfus*, the D.C. Circuit's predecessor considered whether a wrongly

43

removed official who had been replaced by a putative successor could pursue a mandamus remedy or was required instead to seek a writ of quo warranto to challenge the validity of the successor's appointment. 42 App. D.C. at 319–21. Like mandamus, quo warranto is one of the "effective legal remedies" that historically have been available to wrongly removed officials to "finally settle title to their offices." *Cook*, 146 S. Ct. at 2250. As between the two remedies, *Kalbfus* concluded that "mandamus is the most adequate remedy to restore [the removed official] to his rights." 42 App. D.C. at 321. As explained above, this Court should reach the same conclusion. Because there is some doctrinal inconsistency on this question, however, after Mr. DeLeeuw was confirmed to the NTSB seat that Mr. Brown rightfully still encumbers, Mr. Brown filed a petition out of an abundance of caution pursuant to D.C. Code § 16-3503—while continuing to maintain that the Court could grant complete reinstatement relief in *Brown I*, *see Brown II*, Pet. ¶ 5—asking that the Court grant him leave to issue a writ of quo warranto to Mr. DeLeeuw.  Should the Court conclude that Mr. DeLeeuw's confirmation precludes the Court from granting other forms of relief, quo warranto would be an appropriate vehicle for trying Mr. Brown's claim to the contested NTSB seat. Defendants fail to show any reason why Mr. Brown's petition should be dismissed or why the writ of quo warranto should not be issued in the name of the United States.

Respondent DeLeeuw acknowledges that the District of Columbia's quo warranto statute—which is controlling—authorizes this Court to issue a writ upon a petition by an interested party like Mr. Brown. *See* Defs.' MTD at 44. Respondent also does not deny that Mr. Brown is an "interested party" eligible to petition under D.C. Code § 16-3503. He argues, however, that Mr. Brown has not satisfied that provision's threshold requirement of demonstrating that "the Attorney General or United States attorney refuse[d] to institute a quo warranto proceeding on the request of a person interested." *Id.* Yet it is undisputed that Mr. Brown sent letters to both then-Attorney General Bondi and U.S. Attorney Pirro asking them to issue the writ and requesting a "response or action by April 3, 2026," while noting that the absence of a response by that date would be understood as "a constructive denial of this request" that would lead Mr. Brown to "proceed with the petition" in this Court. *Brown II*, Pet., Ex. A. No response was ever received.

44

Relying on a case in which a pro se litigant asserted a so-called "birther" theory that President Obama was serving unlawfully, Respondent argues that the Attorney General's and the U.S. Attorney's non-responses to a request to institute a quo warranto proceeding should not be considered a refusal for § 16-3503 purposes. Defs.' MTD at 45 (citing *Sibley v. Obama*, 866 F. Supp. 2d 17, 20 (D.D.C. 2012)). But the petition in *Sibley* failed for a slew of independent reasons, including because the petitioner lacked Article III standing and was not an "interested person" eligible to petition under § 16-3503. Notably, the D.C. Circuit affirmed the *Sibley* district court's judgment denying the writ, but did so exclusively on those other grounds, without endorsing the premise that a non-response cannot be a refusal. *See* No. 12-5198, 2012 WL 6603088, at *1 (D.C. Cir. Dec. 6, 2012) (per curiam). Respondent's position would eviscerate § 16-3503 by allowing the Attorney General and the U.S. Attorney to simply pocket any request to issue the writ. And Respondent offers no rationale why interested parties should be able to proceed over the Attorney General's objection, but not in the face of the Attorney General's indifference. Finally, even if a bare non-response is not necessarily equivalent to a refusal, this case is different because Mr. Brown specifically identified a constructive denial date. Against that backdrop, the failure to respond by the identified date is best understood as a denial.

Respondent also finds significant that Attorney General Bondi was replaced by Acting Attorney General Blanche one day before the constructive denial date in Mr. Brown's letter. But the letter, which asked the Attorney General to exercise powers vested in her office, was plainly addressed to Attorney General Bondi in her official capacity. It would, thus, naturally be referred to Acting Attorney General Blanche following Ms. Bondi's removal. *Cf.* Fed. R. Civ. P. 25(d) (providing that when a public officer is proceeding in his official capacity and then ceases to hold office during the pendency of a matter, his successor is to be automatically substituted). Moreover, Respondent makes no such argument about the letter to U.S. Attorney Pirro, who has held her office past April 3, 2026. Her constructive denial is alone sufficient for Mr. Brown to proceed in this Court. *See* D.C. Code. § 16-3503 (specifying that an interested party can file a petition if the Attorney General "or" United States Attorney refuses to institute a quo warranto proceeding).

45

Finally, Respondent asks this this Court to withhold the writ on discretionary grounds "to avoid casting a shadow on Member DeLeeuw's vital work helping to secure the safety of our transportation system." Defs.' MTD at 46. But that same logic compels the conclusion that Mr. Brown should not be kept from performing his own vital work on behalf of the safety of our transportation system. Nor does the fact that Mr. DeLeeuw has been confirmed to Mr. Brown's seat alter the calculus. As *Kalbfus* explained, where the "removal of the relator [was] illegal and void, the office never became vacant, and the attempted appointment of his successor was a mere nullity." 42 App. D.C. at 321.

Quo warranto is quintessentially a mechanism for challenging the validity of the title held by a putative officeholder. The remedy it supplies—a "judgment of ouster"—presupposes that a putative replacement has been installed and, when successful, a quo warranto "will obliterate [the] putative officer's legal status." Samuel L. Bray, *Remedies in the Officer Removal Cases*, 17 J. Legal Analysis 236, 247 (2025). Thus, the presence of a usurper is a precondition to a petition for quo warranto, not a reason to decline to issue the writ. And the kinds of circumstances that would ordinarily justify a discretionary refusal to issue the writ—such as when the petitioner has failed to establish "probable ground for maintaining the proceedings" or the petitioner has unclean hands—have never been asserted to exist here. *See* James L. High, *A Treatise on Extraordinary Legal Remedies* 559 (3d ed. 1896).[25] The writ should therefore issue.

### C. Defendants fail to rebut Mr. Brown's entitlement to injunctive relief.

Alternatively, the Court should issue an injunction against Defendants Homendy and NTSB. The parties agree on the requirements for injunctive relief: in addition to liability, Plaintiff must show irreparable harm and inadequacy of monetary remedies, and the balance of harms and the public interest, which are considered together, must also favor Plaintiff. *See* Defs.' MTD at 46–47. But Defendants' arguments as to why Mr. Brown is not entitled to injunctive relief fall short.

---

[25] Available at https://perma.cc/XQ8R-NKTK.

### 1. Plaintiff has established irreparable harm and inadequacy of monetary remedies.

Mr. Brown's removal deprives him of his statutory right to function which is an irreparable harm that cannot be remedied through monetary relief. Pl.'s MSJ at 20–21. Defendants assert that the D.C. Circuit recently rejected the "'statutory right to function' theory of irreparable injury" in its stay order in *Dellinger v. Bessent*, No. 25-552, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025). Defs.' MTD at 48. But *Dellinger* never stated that a removed official could not establish irreparable injury based on a statutory right to function but instead found that the government's harm was greater than that of the plaintiff in the specific context of a stay pending appeal. *Id.* at \*4.

In contending that a statutory right to function is not an irreparable harm to Plaintiff, Defendants look to general principles involving the termination of government employees, first citing to *Sampson v. Murray*, 415 U.S. 61 (1974). Defs.' MTD at 47. But notably in *Sampson*, the Supreme Court recognized that there are extraordinary situations where loss of a position could constitute irreparable injury. 415 U.S. at 92 n.68. Here, Mr. Brown's loss of a presidentially appointed and Senate-confirmed position at the NTSB is just such an extraordinary situation. *Cf. Perlmutter v. Blanche*, No. 25-5285, 2025 WL 2627965, at \*7 (D.C. Cir. Sep. 10, 2025) (Pan, J., concurring) (finding a "genuinely extraordinary situation" where the President purported to remove the Register of Copyright, "the Legislative Branch's chief advisor on copyright matters, based on the advice that she provided to Congress," which was "akin to the President trying to fire a federal judge's law clerk."). In contrast, Defendants rely mainly on cases that involved only "rank-and-file employees." Defs.' MTD at 47; *see Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155 (7th Cir. 1998) (audit manager at an insurance company); *Davis v. Billington*, 76 F. Supp. 3d 59 (D.D.C. 2014) (Assistant Director of the Congressional Research Service's Foreign Affairs, Defense and Trade Division); *Farris v. Rice*, 453 F. Supp. 2d 76 (D.D.C. 2006) (Public Affairs Counselor at the American Embassy in Bangkok). To the extent Defendants cite cases that involve positions they describe as "unique, singular, or high-level," Defs.' MTD at 47 & n.16, only one even involves a federal position, *Brehm v. Marocco*, No. 1:25-CV-660-RJL, 2025 WL 4083345, at \*3

(D.D.C. Mar. 11, 2025). And *Brehm* distinguished the plaintiff's case from those involving an officer that, like Mr. Brown, was presidentially appointed and Senate confirmed.

Defendants argue that monetary relief would be an adequate alternative remedy. Defs.' MTD at 48. But the availability of back pay is not an absolute bar to an injunction. Defendants' argument again ignores *Cook*, which affirmed a preliminary injunction even where backpay might be available later. 146 S. Ct. at 2250.

### 2. The balance of equities and public interest factors favor Plaintiff.

Defendants rely on *Wilcox* and *Boyle* in arguing that the balance of equities weighs in their favor. But *Wilcox* evaluated a petition for stay pending appeal. A court considering a stay pending appeal must compare harms for the relatively short time period that an appeal lasts. *See Wilcox*, 145 S. Ct. at 1415 ("A stay is appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers *during the pendency of this litigation*.") (emphasis added). Here, in contrast, the Court is deciding whether a permanent injunction should be granted after litigation is over and judgment is final, when there will no longer be any prospect of disruptive and "repeated removal and reinstatement of officers." *Id.* Furthermore, *Wilcox* weighed the equitable factors in the absence of a merits ruling, *id*, as was the case in *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Here, in contrast, this Court only needs to reach the equitable factors if it first finds that Mr. Brown is correct on the merits: that the NTSB's statutory removal protections are consistent with the separation of powers. If that is the case, the risk of harm that the Defendants have identified, the harm caused by "allowing a removed officer to continue exercising the executive power," Defs.' MTD at 49, is largely obviated, as this Court will have found that the government has violated the statute, the statute is constitutional, and the officer does not exercise substantial executive authority. The more analogous case is *Perlmutter*, where restoring the Register of Copyrights to her post "would not interfere with the President's constitutional prerogative to supervise the Executive Branch" in part because "her primary role is to advise Congress" and she did not "exercise considerable or substantial executive power." 2025 WL 2627965, at *8–9 (Pan, J.,

48

concurring). As for Mr. DeLeeuw, as discussed above, because Mr. Brown was never validly removed from his seat, Mr. DeLeeuw never validly took that seat. *See supra* at 46.

And as Congress recognized by statute, it is critically important to the public to have an independent agency that is able to investigate plane crashes and other major accidents and make safety recommendations to prevent future accidents free from political interference, including from the President. Pl.'s MSJ at 21–22. Defendants have no response.

### D. The Court should award declaratory relief.

The Court should, at a minimum, award declaratory relief. A declaratory judgment would clarify the illegality of Mr. Brown's removal and end this controversy. Starting from their (mistaken) premise, addressed *supra* Part IV.C, that Mr. Brown is not entitled to an injunction, Defendants claim, based on *Samuels v. Mackell*, 401 U.S. 66 (1971), that Mr. Brown is also not entitled to declaratory relief because there is essentially no difference between declaratory and injunctive relief. Defs.' MTD at 49–50. Defendants' reliance on *Samuels* is misplaced. In *Samuels*, the plaintiffs—defendants in state court criminal proceedings—sought declaratory and injunctive relief in federal court on the ground that the state laws under which they had been indicted violated the federal Constitution. *Id.* at 67–68. After explaining that *Younger v. Harris*, 401 U.S. 37 (1971), issued the same day, precluded an injunction against the state-court proceedings, the Court held that the same principles precluded a declaratory judgment, in part because declaratory relief in that context would interfere with the state-court proceedings in "virtually the same" way as an injunction. *Samuels*, 401 U.S. at 71–73. But the Court expressly stated that it "express[ed] no views on the propriety of declaratory relief when no state proceeding is pending at the time the federal suit is begun." *Id.* at 73–74.

Here, there is no parallel state-court action, and thus the concerns about comity for state courts and erosion of a jury's role in criminal trials that animated *Younger* and, by extension, *Samuels*, do not apply. *See Younger*, 401 U.S. at 44. Courts have thus squarely rejected this same argument when the government has raised it in other recent removal cases. *Harper v. Bessent*, 795

49

F. Supp. 3d 28, 43 n.9 (D.D.C. 2025); *Grundmann v. Trump*, 770 F. Supp. 3d 166, 181 (D.D.C. 2025), *vacated and remanded on other grounds,* No. 25-5165, 2026 WL 303730 (D.C. Cir. Feb. 4, 2026). Were Defendants' position accepted, it would essentially render the Declaratory Judgment Act—which allows declaratory relief "whether or not further relief is or could be sought"—a nullity. 28 U.S.C. § 2201(a).

> Even if *Samuels* did apply, this case would be one of those "unusual circumstances"
>
> in which an injunction might be withheld because, despite a plaintiff's strong claim for relief under the established standards, the injunctive remedy seemed particularly intrusive or offensive; in such a situation, a declaratory judgment might be appropriate and might not be contrary to the basic equitable doctrines governing the availability of relief.

*Samuels*, 401 U.S. at 73. Here, Defendants have argued that an injunction would intrude on the executive power, *see* Defs.' MTD at 49, and the Supreme Court has cautioned that injunctive relief against the President would be "extraordinary," *see Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992)). In such a situation, it is all the more important that, if the Court determines that the President has violated the law, declaratory relief be granted against the President (and his subordinates). To provide no relief whatsoever in the face of a President's blatant violation of a duly enacted federal statute would be antithetical to the rule of law. *See Clinton*, 520 U.S. at 703 ("[W]hen the President takes official action, the Court has the authority to determine whether he has acted within the law.").

## CONCLUSION

For these reasons, Mr. Brown respectfully requests that the Court grant his motion for partial summary judgment on Count I and deny Defendants' motion to dismiss in *Brown I*. The Court should also grant Mr. Brown's petition for writ of quo warranto in *Brown II*.

Dated: August 12, 2026                    Respectfully submitted,

                                          */s/ Ross Snyder*
                                          Cynthia Liao (D.C. Bar No. 90036947)*^
                                          Ross Snyder (D.C. Bar No. 90037922)*^
                                          Joshua M. Salzman (D.C. Bar No. 982239)^
                                          Catherine M.A. Carroll (D.C. Bar No. 497890)*^
                                          Elena Goldstein (D.C. Bar No. 90034087)*^
                                          **DEMOCRACY FORWARD FOUNDATION**
                                          P.O. Box 34553
                                          Washington, DC 20043
                                          (202) 448-9090
                                          rsnyder@democracyforward.org

                                          Jon M. Greenbaum (D.C. Bar No. 489887)*^
                                          **JUSTICE LEGAL STRATEGIES PLLC**
                                          P.O. Box 27015
                                          Washington, D.C. 20038
                                          (202)601-8678
                                          jgreenbaum@justicels.com

                                          * *Counsel for Plaintiff in* Brown I
                                          ^ *Counsel for Petitioner in* Brown II

51